```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
                        SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                   Plaintiff,
                                          HONORABLE JULIAN ABELE COOK, JR.
     v.
                                          No. 11-20677
LATOYA PERRY,

                   Defendant.
_____/



                        SENTENCING HEARING


                    Friday, March 7, 2014



Appearances:

FOR THE GOVERNMENT:             MICHAEL MARTIN, ESQ.
FOR THE DEFENDANT:              LISA DWYER, ESQ.
                          -    -    -
```

*To obtain a certified transcript, contact:*
*Lawrence R. Przybysz, MA, CSR, RPR, RMR, CRR*
*Official Federal Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 718*
*Detroit, Michigan  48226*
*(313)414-4460.  Lawrence_Przybysz@mied.uscourts.gov*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

*Sentencing Hearing*
*Friday, March 7, 2014*

**I N D E X**

- - -

| Defendant's Case in Chief | Page | Vol. |
|---|---|---|
| **Jeffrey Wendt** | | |
| Direct Examination By Ms. Dwyer: | 18 | 1 |
| Direct Examination By Ms. Dwyer: | 18 | 1 |
| Cross-Examination By Mr. Martin: | 64 | 1 |
| Redirect Examination By Ms. Dwyer: | 82 | 1 |

Certification of Reporter .....................148

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*                                                    3
*Friday, March 7, 2014*

```
 1                              Detroit, Michigan
 2                              Friday, March 7, 2014
 3                              1:00 p.m.
 4                          -    -    -
 5              THE COURT CLERK:  The court calls case number
 6    11-CR-20677, United States of America versus Latoya Perry.
 7              THE COURT:  Good morning.
 8              MR. MARTIN:  Good morning, your Honor.
 9    Michael Martin for the Government.
10              MS. DWYER:  Good morning, your Honor.  Lisa
11    Dwyer on behalf of Latoya Perry.
12              THE COURT:  Today is the date that has been
13    scheduled by the Court for the imposition of a sentence
14    upon the defendant, Latoya Perry.  Before we get into some
15    other matters I want to take care of some housekeeping
16    matters first.
17         I want to acknowledge my receipt of certain
18    documents that I will or may rely upon before imposing a
19    sentence upon Ms. Perry.  The first is the Presentence
20    Investigation Report.  Let me ask each counsel if either
21    of you have received a copy of the Presentence
22    Investigation Report?
23              MR. MARTIN:  The government has received a
24    copy, your Honor.
25              MS. DWYER:  As has the defense.
```

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*
*Friday, March 7, 2014*                                        4

1          **THE COURT:**  Let me speak to both counsel.

2    Based upon your reading of the Presentence Investigation

3    Report, are there any corrections or modifications to that

4    report that in your judgment will be necessary before I

5    impose a sentence upon Ms. Perry?

6          **MR. MARTIN:**  None from the Government.

7          **MS. DWYER:**  None, your Honor.

8          **THE COURT:**  All right.  I have received a

9    number of letters from Ms. Perry, all of which have been

10   ostensibly written by her and presumably addressed to me.

11   At my request, Ms. Doaks, my case manager has reproduced

12   these letters and forwarded them to you.  I want to know

13   if you have received copies of Ms. Perry's letters.  Many

14   of them lack a date so I cannot define a particular date

15   when the letters were sent or received.

16         **MR. MARTIN:**  I think the Government has

17   received them all.  Of course, I don't know exactly what

18   has been sent to your Honor.  If I don't have any, I would

19   waive my interest in seeing them so we could proceed

20   today.

21         **MS. DWYER:**  Similarly, I believe I have them

22   all because the Court has been very good about getting me

23   copies.

24         **THE COURT:**  Do either counsel wish to look at

25   these letters before I proceed?

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*
*Friday, March 7, 2014*                                    5

```
 1              MR. MARTIN:  No, sir.

 2              MS. DWYER:  No, sir.

 3              THE COURT:  Just a few minutes ago I received

 4   documents that presumably were initiated by Ms. Perry.

 5   Facially it appears that Ms. Perry has been complaining

 6   about certain problems at the prison where she is right

 7   now.  I have not looked at them.  But I want to share them

 8   with Ms. Perry's counsel before I reproduce them and

 9   forward them to Mr. Martin because I want to avoid the

10   possibility that there may be some incriminating

11   information in there.  Have you received these letters?

12              MS. DWYER:  Yes, your Honor.

13              THE COURT:  Have you had an opportunity to

14   examine them?

15              MS. DWYER:  I have.

16              THE COURT:  Is there anything in your opinion

17   that would arguably prejudice your client as it relates to

18   this case?

19              MS. DWYER:  I would say yes.

20              THE COURT:  I think it would be imperative

21   before I share these with Mr. Martin that I get from you

22   some --

23              MS. DWYER:  -- record?

24              THE COURT:  Record, right.

25              MS. DWYER:  As an offer of proof, your Honor,
```

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*                                          6
*Friday, March 7, 2014*

1  I would say that overall, it is more of what we have seen.

2  However, there appear to be -- there is a discussion about

3  an incident at the jail that may have criminal

4  implications.  I don't know.  But she makes some

5  statements that regard an accusation that was made against

6  her.  And I hesitate to share them with the Government in

7  case that becomes or is used against her in some future

8  prosecution.  I don't expect that to happen.  I really

9  don't.  I don't expect that to happen.  But I don't know

10  how aggressive the Prosecutor would be about forcing the

11  issue.

12          **THE COURT:**  I want to make certain that any

13  correspondence from Ms. Perry directed to me are made

14  available to the Government counsel.  And so that is why I

15  am speaking to you about this packet of letters.

16          **MR. MARTIN:**  Your Honor, perhaps maybe if

17  defense counsel is in agreement perhaps you could just,

18  for purposes of the sentencing today, disregard or not

19  consider that particular letter.  So therefore you

20  wouldn't need to share it with the Government if it's not

21  going to be a factor in your sentencing.

22          **THE COURT:**  Actually, there is more than one

23  letter.  But if you find Mr. Martin's suggestion to be

24  acceptable, then I will disregard that.  But knowing

25  Mr. Martin, that if you desire, it is here.  And clearly I

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*                                                    7
*Friday, March 7, 2014*

1    have not been and will not be adversely affected by the

2    content of Ms. Perry's letter.  Do you believe that there

3    is anything that I should read and convey to Mr. Martin

4    that would have some positive affect before Ms. Perry's

5    sentence today?

6              **MS. DWYER:**  Your Honor, I believe that for

7    the most part these letters are, not more of the same, but

8    consistent with her pattern letters where she is, you

9    know, paranoid perhaps, a little delusional perhaps.  I

10   think she perhaps is a little histrionic.  However, we

11   have plenty of that evidence as a basis from her previous

12   letters.  So these letters do not have to be considered.

13   And I don't think there is anything in here that must be

14   shared with Mr. Martin to assist him with his preparation

15   for sentencing.  Is that the right answer?

16             **THE COURT:**  I suppose so.  I just simply want

17   to make certain that I am not the recipient of any

18   communications from anyone who has an interest in this

19   case.  And no one can have a greater interest in this case

20   than Ms. Perry.

21             **MS. DWYER:**  That's right.

22             **THE COURT:**  But I want to make it known to

23   everyone that I have received these documents.  I have not

24   read them so I am not influenced by the content.  But if

25   the Government through Mr. Martin believes that he as a

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*
*Friday, March 7, 2014*

8

```
1    counsel for the Government should examine them, I will
2    then defer that decision to you.
3              MR. MARTIN:  I do not believe -- I do not
4    have an interest in examining them if the Court is not
5    examining them or considering them as part of this
6    hearing.
7              MS. DWYER:  I accept that.
8              THE COURT:  All right.  I will put those
9    letters from Ms. Perry aside.  But I want to acknowledge
10   my receipt of these letters from Ms. Perry.
11             I have also received a Sentencing Memorandum from
12   the Government as well as a document entitled, quote,
13   Government's Supplemental Sentencing Memorandum.  Has
14   everyone received copies of the Sentencing Memorandum from
15   the Government as well as the Government's Supplemental
16   Sentencing Memorandum?
17             MS. DWYER:  Yes, your Honor.
18             THE DEFENDANT:  Yes, your Honor.
19             THE COURT:  All right.  Mr. Martin, have you
20   received a copy of Ms. Dwyer's Sentencing Memorandum?
21             MR. MARTIN:  Yes, sir.
22             THE COURT:  Are there any documents that in
23   the opinion of the respective counsel that I have not
24   identified today and believe that I should take them into
25   consideration before I impose a sentence?
```

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*
*Friday, March 7, 2014*                                                9

1          **MS. DWYER:**  Your Honor, have you had an

2    opportunity to review Doctor Wendt's report?

3          **THE COURT:**  The answer is yes and yes.

4          **MS. DWYER:**  As well as the Government's

5    Doctor, Doctor Johnson.

6          **THE COURT:**  Yes.

7          **MS. DWYER:**  Okay.  Thank you.

8          **THE COURT:**  Mr. Martin?

9          **MR. MARTIN:**  Beside those two reports, I have

10   nothing.

11         **THE COURT:**  All right.  Is it my

12   understanding that either or both of these men who just

13   mentioned are expected to testify today.

14         **MS. DWYER:**  Mr. Wendt, Doctor Wendt, excuse

15   me, is going to testify.

16         **MR. MARTIN:**  And Doctor Johnson who is a

17   female, your Honor, she is not.  She is located in

18   California so she is not here today.

19         **THE COURT:**  All right.  Ms. Dwyer, the report

20   that I read from Doctor Wendt is dated July 3, 2013.  Is

21   that the report that I should rely upon?

22         **MS. DWYER:**  Yes, your Honor.

23         **THE COURT:**  Any other medical reports or

24   reports from Doctor Wendt?

25         **MS. DWYER:**  Nothing, your Honor.

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*
*Friday, March 7, 2014*                                      10

```
 1              THE COURT:  For scheduling purposes, do you
 2    have an estimation as to how long his testimony will take?
 3              MS. DWYER:  It will not take more than an
 4    hour, your Honor.
 5              THE COURT:  All right.  With that in mind, do
 6    either counsel have an objection to any content within the
 7    Presentence Investigation Report?
 8              MR. MARTIN:  No, sir.
 9              MS. DWYER:  No, sir.
10              THE COURT:  Ms. Dwyer, I would ask your
11    client to examine pages eight.
12              MS. DWYER:  Your Honor, page eight of which
13    document, please?
14              THE COURT:  I'm sorry.  Presentence
15    Investigation Report.  Pages eight through and including
16    twenty of the Presentence Investigation Report and, more
17    specifically, to paragraphs 29 through and including 68.
18    The pages to which I have made reference and the
19    paragraphs to which I have made reference constitute the
20    Probation Department's compilation of the adult criminal
21    convictions relating to Ms. Perry.  And the question I
22    pose to Ms. Perry, and although I will ask Ms. Perry to
23    defer to Ms. Dwyer before answering, is whether these
24    references are -- represent an accurate representation of
25    your criminal record?  So I would ask Ms. Perry to look
```

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*
*Friday, March 7, 2014*                                        11

1    through them carefully and check with your counsel before

2    answering.

3              **MS. DWYER:**  Your Honor, while Ms. Perry is

4    reviewing those documents I should note that I spoke with

5    Ms. Green, and, sorry, with the probation officer, and

6    mentioned that paragraph 48 and paragraph 32 represented

7    one arrest.  And it's sort of indicated in the body of the

8    explanation of the crime.  In fact, in paragraph 32 which

9    is the notation regarding the escape conviction within the

10   body of the explanation of the crime, it does say that her

11   plea on the escape resulted in the dismissal of the

12   delivery that is in paragraph 38.  And although they have

13   a different docket number, the dismissal portion, in terms

14   of the disposition, they do reference the case number in

15   paragraph 32.  That's the only thing.

16             **THE COURT:**  In your opinion is the content

17   within paragraph 32 on pages nine and ten accurate? If it

18   is not accurate, please tell me in what manner it is

19   inaccurate.

20             **MS. DWYER:**  This is accurate, your Honor.

21             **THE COURT:**  All right.  Turning to Ms. Perry,

22   I ask you to be sworn.

23        (Defendant is sworn at or about 10:40 a.m.)

24             **THE COURT:**  Ms. Perry, have you had an

25   opportunity to review the Presentence Investigation

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*
*Friday, March 7, 2014*                                          12

1    Report?

2                **THE DEFENDANT:**  Yes, sir.

3                **THE COURT:**  Is there anything within this

4    report that in your opinion is inaccurate?

5                **THE DEFENDANT:**  No.

6                **THE COURT:**  Let me be more specific.  Have

7    you had an opportunity to look to paragraphs 29 through

8    and including --

9                **THE DEFENDANT:**  -- 29 --

10               **THE COURT:**  -- through and including

11   paragraph 44, that in your opinion is inaccurate?  Those

12   paragraphs to which I have made reference are under the

13   category of Part B, the Defendant's Criminal History, and

14   as a subheading, it is Adult Criminal Convictions.

15               **MS. DWYER:**  Yes, your Honor.

16               **THE DEFENDANT:**  Yes, sir.

17               **THE COURT:**  Yes as to what?  It is accurate

18   or inaccurate?

19               **THE DEFENDANT:**  Accurate.

20               **THE COURT:**  Ms. Perry or Ms. Dwyer, according

21   to the Presentence Investigation Report, the criminal

22   convictions to which I have made reference result in a

23   subtotal Criminal History Score of 14.  Let me rephrase

24   that.  According to the Presentence Investigation Report,

25   the presentence table under Sentencing Guideline, Chapter

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*
*Friday, March 7, 2014*                                          13

```
 1    Five, Part A, a Criminal History Score of sixteen

 2    establishes a Criminal History Category of six.

 3              I speak to both counsel.  Do both counsel or

 4    either counsel agree with that recitation?

 5              MR. MARTIN:  The Government agrees, your

 6    Honor.

 7              MS. DWYER:  Your Honor, her career, excuse

 8    me, I believe her Criminal History points in addition to

 9    the Career Offender Provision is what is driving the

10    Criminal History Category Six.

11              THE COURT:  What is the basis for that

12    comment?

13              MS. DWYER:  Because if the Criminal History

14    category scored with the points from her convictions is

15    lower than the criminal history, excuse me, career

16    offender provision, then the career offender provision is

17    entered as the highest Offense Level total.  So the

18    Criminal History Category I believe in this case may have

19    increased due to the career offender provision.

20              MR. MARTIN:  But if I may, your Honor, we

21    have two things going on here.  One is the defendant, if

22    you score her Criminal History, she is -- she has sixteen

23    points and is a Category Six.  In addition, she also is a

24    career offender under the guidelines which would, if she

25    wasn't already a Category Six, would automatically place
```

*11-20677; United States of America v. Latoya Perry*

1    her in a Category Six.  So no matter how you slice it in

2    this case, whether you tally up all of her criminal

3    convictions and score them with points or whether you

4    qualify her as a career offender, she is a Category Six.

5    And I would just note that as part of the Plea Agreement

6    in this case, the parties acknowledge and agree that she

7    was a Criminal History Category Six.

8              **MS. DWYER:**  That's correct, your Honor.  And

9    in fact, I would withdraw my statements.  I was inaccurate

10   about the criminal history scoring.  It was the Offense

11   Level scoring I was referring to.  And please excuse me.

12             **THE COURT:**  So can we conclude that according

13   to the Presentence Investigation Report, Ms. Perry has a

14   total criminal history score of sixteen.

15             **MR. MARTIN:**  I believe from the Government's

16   perspective, that is accurate and correct.

17             **MS. DWYER:**  At this point I have no reason to

18   dispute it.  If I -- I have so many documents.  Excuse me,

19   your Honor.  Your Honor, I counted fifteen points.  But it

20   wouldn't change her Criminal History Category.

21             **THE COURT:**  According to paragraph 47 of the

22   Presentence Investigation Report which appears on page 18,

23   the following words appear:  According to the sentencing

24   table of Sentencing Guideline Chapter Five, Part A, a

25   Criminal History score of sixteen establishes a Criminal

1    History Category of six.  You take issue with that

2    comment?

3              **MS. DWYER:**  No, your Honor.  Your Honor,

4    probation is indicating that I was correct, that it's 15.

5              **PROBATION OFFICER:**  Ms. Dwyer is correct,

6    your Honor, however, it doesn't change the Criminal

7    History Category.

8              **THE COURT:**  I also ask counsel to look to

9    paragraph nine in the Presentence Investigation Report

10   which appears on page five.  This is a question I ask of

11   both counsel.  Do you concur that the following language

12   appears and is binding in this case?  Quote, the parties

13   agree that the defendant, referring to Ms. Perry, is a

14   career offender and that her guideline range is 188 to 235

15   months as calculated in the attached worksheets.  The

16   parties also agree that the defendant is subject to a

17   statutorily mandated term of imprisonment of at least five

18   years.  Pursuant to Federal Rule of Criminal Procedure

19   11(c)(1)(c),  the parties agree that the sentence of

20   imprisonment for Count Two shall be at least seven years.

21   The Government also agrees not to request a sentence above

22   the top of the guideline range calculated in part 2B.  Is

23   that the position of the defendant as well?

24             **MS. DWYER:**  Yes, your Honor.

25             **THE COURT:**  Government?

*11-20677; United States of America v. Latoya Perry*

*Sentencing Hearing*
*Friday, March 7, 2014*

16

```
 1              MR. MARTIN:  Yes, sir.

 2              THE COURT:  Ms. Dwyer, when do you expect or

 3     hope to have Doctor Wendt to testify?

 4              MS. DWYER:  When the Court is ready.  He is

 5     here.

 6              THE COURT:  Do you as a counsel for the

 7     defendant have any recommendation as to when she should

 8     testify?  Now or at a later time?

 9              MS. DWYER:  Because you have reviewed the

10     reports and documents, I believe we may be ready to call

11     him now.

12              THE COURT:  Mr. Martin, do you have any

13     recommendation to the Court as to when Doctor Wendt should

14     testify?

15              MR. MARTIN:  No.  That makes sense to me that

16     he testify now.

17              MS. DWYER:  Shall I call him, your Honor?

18              THE COURT:  The answer is yes.

19              MS. DWYER:  Thank you.

20                        -   -   -

21              JEFFREY WENDT,

22        being first duly sworn by the Court to tell

23        the truth, was examined and testified upon

24        their oath as follows:

25                        -   -   -
```

*11-20677; United States of America v. Latoya Perry*

 1                    **DIRECT EXAMINATION**

 2   **BY MS. DWYER:**

 3      **Q.**  Please state your name?

 4      **A.**  My name is Jeffrey Wendt, last name W-e-n-d-t.

 5                    **DIRECT EXAMINATION**

 6   **BY MS. DWYER:**

 7      **Q.**  Excuse me.  I'm sorry, your Honor.  Okay.  Doctor

 8   Wendt, please let us know what your educational background

 9   is.

10      **A.**  I have a bachelor's degree in psychology from

11   Hillsdale College, Master's in Experimental Psychology

12   from East Carolina University, and Ph.D. in Clinical

13   Psychology from here in Wayne State in 2002.  I worked at

14   the Center For Forensic Psychiatry from 2002 to 2006 where

15   I received intensive training in the area forensic

16   psychology and was certified as a consulting forensic

17   examiner.

18            I have had over a hundred hours of continuing

19   education in the field of forensic psychology since that

20   time in the areas of psychological testing, assessment of

21   malingering, violence risk and the assessment of

22   psychopathy.

23            While at the forensic center I conducted over

24   500 evaluations of criminal defendants.  And since that

25   time I have engaged in private practice in forensic

1    psychology where I have conducted approximately 1500

2    additional evaluations.  I have been qualified to testify

3    in the area of forensic psychology approximately 100

4    times, generally for issues of competency to stand trial,

5    legal insanity or criminal responsibility and sentencing

6    issues.

7       **Q.**  Doctor, for the record, would you explain what the

8    center for forensic psychology is?

9       **A.**  It's part of the Department of Community Health for

10   the State of Michigan.  It's responsible for conducting

11   forensic evaluations of criminal responsibility and

12   competency for the entire State of Michigan.  It's also an

13   in-patient maximum security psychiatric hospital where

14   people who have been found incompetent to stand trial or

15   legally insane are hospitalized.  I was also involved in

16   the treatment and at the hospital as well.

17      **Q.**  There was a time recently, I think that you

18   testified in a case before Judge Rosen, is that correct?

19      **A.**  Yes.

20      **Q.**  That was United States versus Black?

21      **A.**  Yes.

22      **Q.**  Can you give us a short version of the charges and

23   why your testimony would have been relevant?

24               **THE COURT:**  You mean, would have been

25   relevant or --

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                    19

1              **MS. DWYER:**  Well, let me rephrase the

2      question.  Thank you, your Honor.

3   **BY MS. DWYER:**

4      **Q.**  You were engaged as an expert in the Black case, is

5      that correct?

6      **A.**  Yes.

7      **Q.**  And during your evaluation of the defendant -- is it

8      true that you conducted an evaluation of the defendant?

9      **A.**  Yes, I was asked by an attorney at the Federal

10     Defender's Office to evaluate the defendant, Rosan (ph)

11     Black who was charged with weapons related offenses, to

12     evaluate him regarding his competency to stand trial and

13     his mental state at the time of the offenses, for criminal

14     responsibility which I did do those evaluations.

15     **Q.**  All right.  As part of your evaluations, were you --

16     as part of your evaluation would you ordinarily interview

17     family members?

18     **A.**  It's not unusual to evaluate or to interview the

19     family members of a defendant.

20     **Q.**  And did you do that in the Black case?

21     **A.**  Yes.

22     **Q.**  Were you qualified as an expert in the Black case?

23     **A.**  Yes.  I was qualified twice as an expert in the area

24     of forensic psychology both -- I testified at the

25     competency hearing in this courthouse on April 26th, 2010

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                            20

1    and generally was qualified as an expert in forensic

2    psychology at the jury trial before Judge Rosen.  It was

3    in late May, 2012.

4        **Q.**  Okay.

5             **MS. DWYER:**  At this time, your Honor, I move

6    to qualify Doctor Wendt as an expert in forensic

7    psychology.

8             **THE COURT:**  I will reject that request.  Let

9    me be specific.  It has been my practice and policy over

10   the last 30 years to never identify a witness as an

11   expert.  My rationale for that view is that if the

12   proponent of the witness believes that the witness is

13   qualified to opine, he may do so subject to examination or

14   opposition by the opponent.  So that my rejection of

15   Doctor Wendt is not based on my assessment of his

16   character or his qualifications but simply on

17   long-standing policy that I have to allow the parties free

18   opportunity, free rein to present a witness without the

19   trappings of being an expert.

20             **MS. DWYER:**  Thank you, your Honor.  I will

21   proceed.

22             **THE COURT:**  I normally in criminal cases

23   would advise counsel ahead of time.  But I did not have

24   the opportunity to do so.  So it is not thought to be or

25   should not be thought to be a reflection on my assessment

*11-20677; United States of America v. Latoya Perry*

1    of Doctor Wendt or his character or his qualifications.

2                **MS. DWYER:**  Thank you, your Honor.

3    **BY MS. DWYER:**

4      **Q.**  Doctor Wendt, are there standard procedures and

5    methods for conducting your forensic psychological

6    evaluation?

7      **A.**  Yes.  Forensic evaluation is somewhat different than

8    a therapeutic evaluation in that in the forensic setting

9    there is a motivation quite often for a defendant to

10   exaggerate or in some cases minimize psychological

11   problems.  Therefore, the forensic psychological

12   evaluations involve gathering information from a variety

13   of sources which I did in this case.  One is a review of

14   the case materials and the charges, witness statements so

15   forth.  Another is a clinical interview of the defendant

16   regarding their history and past and current symptoms.

17   The third is the administration of psychological testing

18   for two purposes -- both to look at the defendant's manner

19   of responding in terms of exaggeration or minimization and

20   also to identify what problems they do have

21   psychologically.  I also reviewed available treatment

22   records and behavioral reports from county jails.

23     **Q.**  And those county jails were Wayne County, St. Clair

24   County and Midland, is that correct?

25     **A.**  That's right.

                *11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                    22

1      **Q.**  All right.  There were notes in Doctor Johnson's

2      report regarding observations she made of Ms. Perry.  Did

3      you consider those as well?

4      **A.**  Yes.  After issuing my report in this case I had the

5      opportunity to review additional materials in preparation

6      for this hearing.  Those involved, one, a psychological

7      report issued by Doctor Johnson, also additional

8      behavioral records from the jails and two Sentencing

9      Memorandums.  I did consider the information contained in

10     those sources including Doctor Johnson's report.

11     **Q.**  Okay.  And just one more note.  Did you have the

12     opportunity to read letters that had been written by Ms.

13     Perry, correct?

14     **A.**  I was provided with extensive, over a hundred pages

15     of handwritten letters prepared by the defendant that also

16     informed my opinion.

17     **Q.**  Okay.  This procedure that you used, is that the

18     standard procedure?

19     **A.**  It's the -- my procedures for conducting a forensic

20     evaluation are standard with that conducted at the Center

21     For Forensic Psychiatry and, in my experience, by the

22     majority of forensic psychologists that I am aware of.

23     And it's a standard practice.

24     **Q.**  Could you please describe Ms. Perry's presentation

25     to you during the interview?

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

23

 1    **A.**  I met with Ms. Perry at the Midland County Jail in,

 2    on May 30th, 2013 in a session lasting four hours and

 3    forty-five minutes.  When I met with her she was

 4    prescribed in taking two medications, Neurontin and

 5    Topomax.  Both of those are anti-convulsant medications

 6    often prescribed at mood stabilizers for the treatment of

 7    bipolar disorders.

 8            Despite treatment with these medications, her

 9    speech was pressured and difficult to interrupt.  Her

10    affect, her emotional expression was labile, meaning that

11    she at times would laugh at inappropriate times and cry.

12    So her affect had a much wider range than most criminal

13    defendants.

14            She described her symptoms currently and in the

15    past.  She described a long term history of depressed

16    mood.  She described a history of manic symptoms involving

17    her energy levels, activity levels, sleep patterns,

18    including racing thoughts, mood swings, and impulsive

19    behavior that were relevant to the diagnosis.

20            I observed her behavior that was relevant to

21    diagnosis also in terms of her pressured speech and

22    associated racing thoughts.  She was thinking and speaking

23    very rapidly which is often a sign of a mood disorder.

24            She described symptoms of anxiety related to

25    traumatic events in the past and she said that she had

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                                24

1    never made suicide attempts and was not suicidal when I

2    met with her.

3        **Q.**  Thank you.  As far as the post-traumatic stress and

4    the anxiety that you observed during your clinical

5    interview, did she advise you of significant abuse as you

6    suggested?

7        **A.**  As part of the evaluation I asked her a series of

8    questions about her history.  The reason this is

9    important, it's because understanding her history helps

10   understand her symptoms as an adult because it's my

11   opinion that these early experiences contributed to the

12   development of her mental health symptoms and substance

13   abuse as an adult.  She described it a traumatic and

14   chaotic developmental history saying that she had been

15   physically abused by her mother's husband, a stepfather,

16   as a child.

17           She reportedly frequently witnessed physical

18   abuse by the stepfather toward her mother.  She said that

19   she had been the victim of sexual abuse by her mother's

20   brother, an uncle, beginning at age seven and this

21   continued for several years.

22           Skipping forward, she described an incident of

23   abuse in 2004 where she was reportedly abused by a guard

24   in the District Court in Detroit while an inmate.  She

25   said that when she was 12 years old she escaped from the

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

25

1    abusive environment of her home and assaulted the

2    stepfather when she left.  She said that as a young

3    adolescent, twelve, thirteen, fourteen years old that she

4    engaged in a sexual relationship with older men for

5    protection and support after leaving the family home.  She

6    said that the environment that she lived in was rife with

7    violence and drug use, drug selling, weapons and frequent

8    exposure to violence.  And the reason this is important is

9    because I think these experiences contributed to some of

10   the problems that she experiences as an adult currently.

11   **Q.**  Did you have reason to have faith in her report of

12   the 36th District court assault?

13   **A.**  It's my understanding that this issue was

14   investigated and that she received a financial settlement

15   as a result of it.  And in my opinion that bolstered the

16   validity of her self report.

17   **Q.**  Thank you.  During her clinical interview did she

18   make any indication about her family and the possible

19   history of mental illness?

20   **A.**  She reported that her biological father had been

21   treated for mental health concerns at the Veteran's

22   Administration.

23   **Q.**  And did you have -- you had the opportunity, of

24   course, to review the medical records from DCC, correct?

25   **A.**  Yes.  Detroit Central City Community Mental Health.

*11-20677; United States of America v. Latoya Perry*

1    **Q.**  Have you worked with them the past?

2    **A.**  I have had the opportunity to review treatment

3    records from that facility from time to time.  I never

4    worked with them directly.

5    **Q.**  Okay.  When you reviewed the Detroit Central City

6    records, did you -- was there anything within them that

7    suggested a mental illness?

8    **A.**  I reviewed these records -- Ms. Perry was apparently

9    referred to treatment as part of a Diversion Program from

10   the court.  That's my understanding.  She first presented

11   for treatment in February of 2011 after the commission of

12   this offense but prior to her incarceration for this

13   offense.  At that time she reported a variety of symptoms

14   including verbal aggression, depressed mood, decreased

15   energy, hopelessness, worthlessness, irritability, panic

16   attacks and grief.

17          She was diagnosed by the clinicians at Detroit

18   Central City -- she participated in two evaluations in

19   February lasting three hours total.  She was diagnosed

20   with Bipolar One Disorder, poly-substance substance abuse.

21   And the clinician made a note that she should be assessed

22   for Post-Traumatic Stress Disorder.

23          In reviewing these records, in the context of a

24   forensic evaluation, it's important to look at -- for

25   signs that speak to the validity of the person's self

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

27

1    report.  I noted that Ms. Perry did not take that

2    opportunity to report more severe symptoms such as hearing

3    voices or having multiple personalities, things along that

4    nature that are often reported in people who are

5    malingering mental illness.  She was asked directly and

6    she denied those symptoms.

7          In addition, the clinicians, even though she

8    denied these major symptoms, the clinicians made

9    observations of her behavior that were consistent with

10   mental health diagnosis.

11         In terms of her pressured speech, agitated

12   behavior, and so forth, she was prescribed with Remeron,

13   an anti-depressant medication, and Neurontin which is

14   another anti-convulsant for a mood stabilization.  Then on

15   March 11th when she met with the psychiatrist, she again

16   did not report these psychotic symptoms and her

17   medications were changed to Remeron which is the

18   anti-depressant and Zoloft, another anti-depressant. She

19   was noted to experience some improvement from treatment.

20   However, her treatment was cut short.  She was only

21   treated from February to April because she was picked up

22   by the US Marshals for this case which ended treatment at

23   DCC.

24   **Q.**  When you reviewed the Sentencing Memorandum by

25   Mr. Martin, there was an indication by him that that was a

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*
28

1    fifteen minute interview at DCC.  Is that accurate?

2      **A.**   When I read the Sentencing Memorandum it indicated

3    that her diagnosis was based only on a 15 minute

4    interview.  It's my understanding that that is an error.

5    A more in-depth review of the records show that she was

6    diagnosed weeks prior to the date described by Mr. Martin

7    following three hours of contact with two different

8    clinicians.

9              On February 17th she participated in a

10   comprehensive assessment with Social Worker Ronald

11   Williams from 11:30 a.m to 1:00 p.m.  Then in a Case

12   Management Assessment with a second social worker, Arnold

13   Stafford, from 1:30 to 3:00.  In addition, she met with a

14   psychiatrist on the date described in Mr. Martin's

15   Sentencing Memorandum for an additional session.  But she

16   had been diagnosed following the initial treatments, the

17   initial assessments on February 17th.

18     **Q.**   Thank you.  Did you have the opportunity to review

19   records from the Wayne County Jail?

20     **A.**   Yes, I did.

21     **Q.**   All right.  Was there anything in those records that

22   evidenced mental illness?

23     **A.**   The Wayne County Jail records described treatment

24   with a variety of medications.  Over at least ten

25   different psychotropic medications that were changed

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                    29

1    frequently and in my opinion may have been inappropriate

2    for her diagnosis at times.  She was prescribed several

3    anti-depressants -- Effexor, Elavil, Remeron, Senequan.

4    She was prescribed the mood stabilizers that I talked

5    about -- Neurontin, Topomax.  She was prescribed

6    Clonazepam, a benzodiazepine that is often prescribed for

7    anxiety.  She was also prescribed amphetamines --

8    Adderall, a stimulant medication that is used for the

9    treatment of ADHD, Attention Deficit Hyperactivity

10   Disorder.

11           My impression of the wide range of medications

12   that she was prescribed indicates that is there was a

13   perception that she had problems and that the medication

14   she was taking was not adequately treating the problems.

15   Therefore, it was frequently changed and medications were

16   added.

17           I reviewed records, notes, and assessments from

18   the psychiatrist, Dr. Lisa Hinchman (ph), the psychiatrist

19   at the Wayne County Jail.  And during the time when she

20   met with Ms. Perry, Ms. Perry reported a bunch -- several

21   symptoms -- depression, mood swings, irritability.  Again,

22   she had the opportunity -- at this point she knew she was

23   charged with the current offenses and had the potential

24   motivation to exaggerate her mental health symptoms to

25   further her defense.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                    30

```
 1              Again, she denied the symptoms of psychosis or

 2    mania when asked directly by the psychiatrist.  However,

 3    the psychiatrist made notes and observations about Ms.

 4    Perry's behavior that are perhaps more important than what

 5    Ms. Perry told the psychiatrist.  She was described as

 6    loose and tangential thought associations which is often a

 7    symptom of psychosis or mania.  She was described as

 8    having rambling, pressured speech and racing thoughts

 9    which are characteristics of a manic episode.  Patient

10    voiced paranoia.  Affect labile and unpredictable, and she

11    was admitted to the mental health unit of the jail in

12    November of 2012.  Jail clinicians diagnosed Ms. Perry

13    with depressive disorder not otherwise specified.

14       Q.  Was she referred for the psychological ward at the

15    Wayne County Jail?

16       A.  Yes.  In December, 2012 she had been admitted to the

17    mental health unit because, as I noted, even though she

18    denied having manic or psychotic symptoms, these were

19    observed in her behavior by the clinicians at the jail who

20    moved her for a better management of these symptoms.

21       Q.  Let me ask you, when medications are being changed

22    repeatedly and possibly for very good reason, is there

23    really an opportunity for a person to stabilize on meds?

24       A.  There is a wide degree of variation in this because

25    generally when medications are changed, it's my
```

*11-20677; United States of America v. Latoya Perry*

1    understanding that it takes a period of time for the

2    effects to kick in.  And if these medications are changed

3    frequently or the medications are inappropriate, it can

4    trigger symptoms that are targeted to be decreased.

5            For example, administering amphetamines or

6    Adderall to a person with a mood disorder or who has a

7    potential of having a manic condition can trigger mania.

8    Some antidepressants can trigger mania.  And it's possible

9    that her presentation may have been consistent with that

10   or a reaction to inaccurate or inconsistent treatment with

11   medications in the jail.

12   **Q.**  You beat me to the question when you said that.

13   Excuse me.  I'm so sorry.  That the medication --

14   anti-depressants may trigger a manic episode.  Did she, in

15   fact, take any medications for depression, that would have

16   the potential of triggering a manic episode?

17   **A.**  Well, she took a variety of medications, and an

18   individual's reaction to psychotropic medications very

19   widely.  But quite often a person with a manic condition

20   when presented with an anti-depressant medication, it can

21   be triggered.  She was taking at different times several.

22   Effexor, Elavil, Remeron, Celexa and Senequan.  That's

23   five different anti-depressants at different times, either

24   one at a time or in combination with the other medications

25   that were described.

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

32

1   **Q.** When, let's, take a step back and let me ask you to

2   describe what bipolar disorder is.

3   **A.** Bipolar disorder is a mood disorder that involves

4   the presence of both depressive episodes and manic

5   episodes.  A manic episode is a period of expansive,

6   elevated or irritable mood out of character for the

7   average person or for that individual.  During these manic

8   episodes, the individual has a variety of symptoms

9   including inflated self-esteem or grandiosity, a decreased

10  need for sleep.  They may be more talkative or have

11  pressured speech.  They have a flight of ideas or racing

12  thoughts.  They are very distractable, sometimes raising a

13  concern about ADHD.  They have an increase in goal

14  directed activities such as starting businesses or even

15  writing letters, for example.  They have excessive

16  involvement in pleasurable activities with a high

17  potential for painful consequences.  So a person in a

18  manic episode might engage in gambling or risky sexual

19  behavior or other behaviors that have a high potential for

20  negative consequences.

21  **Q.** Okay.

22  **A.** So a manic episode is one part of a diagnosis of

23  bipolar disorder.

24  **Q.** All right.  Therefore, is it fair to assume that

25  these records that you reviewed so far, that indicated

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

33

1    manic episodes, is that correct?  The Wayne County Jail, I

2    think you indicated that, excuse me, that the symptoms

3    that they observed were consistent with a manic episode?

4        **A.**  That's correct.  Both the symptoms that Ms. Perry

5    reported at Detroit Central City, what she reported at the

6    Wayne County Jail and what were observed by the clinicians

7    at those facilities in my opinion were representative of

8    mania in terms of the disorganized speech, the rapid

9    speech, the labile affect, those were important issues in

10   informing my opinion.

11       **Q.**  You had the opportunity to review the Midland County

12   Jail records, is that right?

13       **A.**  Yes.

14       **Q.**  Was there anything in those records that indicated

15   mental illness?

16       **A.**  Yes.  When I read -- I requested the Midland County

17   Jail records and that's where she was housed when I, in

18   fact, met with her, when she was -- during my evaluation

19   of her she was taking two mood stabilizing medications,

20   the anti-convulsants that I described.  I think it was

21   Topomax and Neurontin.

22            Soon after, and despite taking those

23   medications, when I met with her she had the labile

24   affect -- the pressured speech.  Soon after I met with

25   her, within weeks after, according to the records, she was

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

34

 1   then prescribed with -- for the first time she was

 2   prescribed an anti-psychotic medication.  The Midland

 3   County Jail gave her Olanzapine which is also known as

 4   Zyprexa, which is an anti-psychotic medication, in

 5   combination with Effexor, an anti-depressant medication.

 6   The jail records from Midland indicated that she was

 7   diagnosed with a Post-Traumatic Stress Disorder and

 8   depression.

 9   **Q.**  Okay.  And you had the opportunity to review records

10   at Saint Clair County Jail, is that correct?

11   **A.**  Yes.  That was subsequent to issuing my report.  The

12   records that I had from the St. Clair County Jail were

13   behavioral records written by the jail staff.  It's my

14   understanding that at that jail, the mental health records

15   are held by Community Mental Health, not by the jail, so

16   those were not made available.  Even though I had

17   requested them specifically from Community Mental Health,

18   I did not receive those records.  But I have the

19   behavioral records from the deputies.

20   **Q.**  Was there anything within those behavioral records

21   from St. Clair County that would have indicated mental

22   illness?

23   **A.**  The behavioral records did not describe what

24   medications she was taking while she was at that jail, but

25   it described chronic irritability, an argumentativeness.

1    I have the records here.  She was demanding to the jailers

2    and resistant to them.  Some of the things that stood out

3    to me was, some examples on April 99th, 2013, it was noted

4    that she wanted to -- she was cleaning the cell and

5    cleaning the shower at one in the morning and this is

6    consistent with the increase in goal directed activity,

7    decreased need for sleep, perhaps inappropriate behavior

8    and understanding of social conventions regarding her

9    demand to clean in the middle of the night.  That's a

10   condition that's often seen with manic behavior.

11       **Q.**  Okay.  Thank you.  You stated that you had an

12   opportunity to review the letters by Ms. Perry?

13       **A.**  Yes.

14       **Q.**  Did you make any -- draw any conclusion after

15   reading those letters?

16       **A.**  The letters were extensive and contained many

17   details that would not be considered by other people to be

18   relevant to her defense or her adjustments.  Her letters

19   revealed concerns about germs or contamination, her access

20   to cleaning supplies in the jail.  They referred to

21   paranoia in terms of concerns that the jailers were not

22   letting her letters be delivered.  And maybe most of all,

23   it revealed a manic energy for writing letters with a

24   pressured demeanor and maybe a flight of ideas that are

25   consistent with manic behavior.

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

1          One of the diagnostic criteria for a manic

2     episode involves the flight of ideas, evidenced by a

3     nearly continuous flow of accelerated speech with abrupt

4     changes from one topic to another.  In the Diagnostic And

5     Statistical Manual For Mental Disorders it specifically

6     says, in diagnosing a manic episode, some individuals

7     write a torrent of letters on many different topics to

8     friends, public figures, or the media.

9          It was my observation that her production of

10    these letters, the manner that she wrote them, and the

11    content of the letters was consistent with the

12    hypergraphia, the pressured writing often seen in a manic

13    episode.  This was consistent with her overall

14    presentation in my opinion.

15    **Q.**  Thank you.  And you did have the opportunity to

16    review certain incident reports from the Wayne County

17    Jail, is that true?

18    **A.**  Yes.

19    **Q.**  And is it fair to say that those incident reports

20    occurred in 2013 with the most latest incident report

21    being February 11th, 2014.  Is that correct?

22    **A.**  Yes, I had incident reports from prior to my

23    evaluation and then recently received incident reports

24    from February of this year involving allegations of

25    inappropriate sexual behavior -- touching the other

*11-20677; United States of America v. Latoya Perry*

1    inmates on the chest, observing -- before my evaluation,

2    one of the incidents involved observing the other female

3    inmates as they showered.  Many of the incident reports

4    involve an argumentative presentation by Ms. Perry.

5    **Q.**  Regarding the incident reports alleging sexual

6    misconduct or sexual harassment, is that consistent with a

7    period of mania?

8    **A.**  As I described earlier, one of the diagnostic

9    criteria for a manic episode involves excessive

10   involvement in pleasurable activities that have a high

11   potential for negative consequences.  One of the examples

12   specifically provided for this is inappropriate sexual

13   behavior.  So it's not uncommon for a person in a manic

14   episode to not respect personal boundaries in terms of

15   their speech, physical violence sometimes and also sexual

16   behavior.  So her -- these conduct reports, in my opinion,

17   are consistent with a finding of Bipolar Disorder.

18   **Q.**  You performed psychological testing on Ms. Perry,

19   correct?

20   **A.**  Yes.

21   **Q.**  And was that one or two tests that you completed

22   with Ms. Perry?

23   **A.**  I administered the Personality Inventory and then I

24   had the opportunity to review testing from Doctor Johnson

25   as well.

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                                38

1    **Q.**  Please explain to the Court the psychological tests

2    and your findings.

3    **A.**  I administered the Personality Assessment Inventory.

4    This test involves -- it's a self-report measure and it

5    provides two very important types of information.  The

6    first in a forensic evaluation is the defendant's

7    propensity to exaggerate problems or to minimize problems.

8    Usually exaggeration is found.

9           When I looked at the validity scales on the

10   Personality Assessment Inventory it indicated that Ms.

11   Perry did not take the opportunity presented by testing to

12   exaggerate.  Knowing the potential role that this

13   evaluation could play in her defense, it was important, it

14   was an important finding to me that she did not take that

15   opportunity.  It was one more example where she did not

16   take the opportunity to malinger where many defendants do.

17          I viewed this in light of Doctor Johnson's

18   report where she administered another self-report

19   personality inventory, the MMPI II which also has validity

20   scales that look for exaggeration or minimization of

21   symptoms.

22          On the MMPI II in late 2013 with Doctor Johnson,

23   Ms. Perry also did not exaggerate symptoms.  In fact, she

24   had a high score on the L Scale which is sometimes known

25   as the Lie Scale.  It's used to determine if a person is

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

1    presenting with a fake good response set, trying to

2    present as much better adjusted than they actually are.

3            Ms. Perry's score on this was quite high.  It

4    was 62 which indicates an attempt to deny negative

5    characteristics and present herself in a favorable light.

6            So I took these findings of psychological

7    testing into consideration in looking at her approach to

8    the evaluations in general over the course of time.  As

9    one more example where she had opportunities to malinger

10   and did not take those opportunities which leads me to

11   believe that her presentation in testing and interviews

12   and in that described in the treatment records is an

13   accurate representation of her mental status.

14           Once you get passed the first step of seeing if

15   testing is valid because of exaggeration or minimization,

16   testing also provides a series of clinical scales that

17   show where the defendant has psychological problems and

18   what areas they do not have psychological problems in.

19           Her -- Ms. Perry's psychological profile

20   indicates problems with substance abuse accompanied by

21   prominent stress and anxiety.  She has a pattern of

22   suspiciousness and hostility and is very tense, fearful,

23   and hypersensitive to what occurs around her.  Excuse me.

24           Although she reported a history of anti-social

25   behavior, illegal behavior, drug use, violating rules, the

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

40

1    PAI breaks down the anti-social personality traits scale

2    into three elements.  And one of which, one of the factors

3    in the anti-social scale is egocentricity.  This is

4    summarized as -- a high score would indicate a lack of

5    empathy and remorse and a generally exploitative approach

6    to interpersonal relationships.

7              In Ms. Perry's profile this was one of the very

8    lowest scores in the clinical profile so that in

9    addressing whether she has psychopathy, anti-social

10   approach, it supported my conclusion, in my opinion, that

11   her anti-social behavior is more a product of her mental

12   health condition and substance use rather than a product

13   of an overall criminal orientation or lack of empathy for

14   others.  So that was an important finding also.

15             I had the opportunity view these results in the

16   context of Doctor Johnson's MMPI findings also that were

17   consistent with this.  The primary finding in Doctor

18   Johnson's MMPI clinical profile was the anti-social trait.

19   That was elevated and that can be skewed by a history of

20   criminal behavior.

21             But Doctor Johnson also reported the clinical

22   scales, the numerical values or T scores for the other

23   scales, even though these were not described in the body

24   of the report, I think it's worth mentioning that on Scale

25   Nine which is hypomania of the MMPI II, Ms. Perry's score

*11-20677; United States of America v. Latoya Perry*

1   was significantly elevated.  The hypomania scale indicates

2   elevated mood, accelerated speech and motor activity,

3   irritability, flight of ideas and periods of depression

4   that are characteristics of bipolar disorder.

5          In addition, the paranoia scale on the MMPI II

6   was also significantly elevated but was not described in

7   the body of the report.  This is relevant to a finding of

8   Post-Traumatic Stress Disorder because this indicates

9   increased arousal and a suspiciousness in certain

10  circumstances and situations.

11         So it was my impression that the psychological

12  test administered that I reviewed both provided valuable

13  information in terms of her -- the validity of her

14  self-report, but they were also consistent with the

15  symptoms that she described and that were observed by

16  myself and other clinicians.

17  **Q.**  Ultimately, what was your diagnosis of Ms. Perry?

18  **A.**  The first diagnosis is based on her traumatic

19  history, that is Post-Traumatic Stress Disorder.  This

20  involves the development of symptoms in response to

21  exposure to an extreme traumatic event, traumatic events

22  that result in PTSD can involve extreme physical and

23  sexual abuse.  And that's my opinion, that this was

24  relevant to Ms. Perry's case.

25         In response to the traumatic event, the

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

42

1    diagnostic criteria involved a response of intense fear,

2    helplessness or horror.  And she described those feelings

3    as a young child in response to the physical abuse and

4    subsequent sexual abuse.

5         Another diagnostics criteria involves recurrent

6    and intrusive, distressing recollections of the event.

7    And she reported that she thinks about the abuse, in her

8    words, all the time.

9         Another diagnostic criteria is efforts to avoid

10   thoughts or feelings associated with the trauma.  And I

11   propose that Ms. Perry's substance use is a reaction to

12   avoid the emotional trauma, to avoid thoughts or feelings

13   associated with this trauma.

14        Another diagnostic criteria involves efforts to

15   avoid activities, places or events that arouse memories of

16   the trauma.  And one example involves how she left the

17   home at age 12 to try to distance herself from this

18   environment.

19        Another criteria involves feelings of detachment

20   or estrangement from others.  The Personality Assessment

21   Inventory indicated that she wants to be close to others

22   but she has a strong need to be accepted by others but has

23   difficulty doing so.  A criteria involves -- one of the

24   primary criteria with Post-Traumatic Stress Disorder

25   involves a foreshortened sense of future where the

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

43

1   individual feels as if they are not going to have a normal

2   life span.  They are not going to have a normal career,

3   family, or a further the way an average person would.

4   Therefore they behave -- they can behave in a reckless

5   manner without regard to the consequences of their

6   behavior.

7         It's my opinion that this played a role in Ms.

8   Perry's history of drug use, selling and using drugs,

9   reckless interpersonal and sexual behavior, and not caring

10   about her behavior or the consequence of her behavior

11   because she did not feel valuable enough.

12         Finally, the last symptom of Post-Traumatic

13   Stress Disorder involves persistent symptoms of increased

14   arousal.  And these can involve difficulty falling asleep

15   or staying asleep which she reportedly has, irritability

16   or outbursts of anger which she reportedly,

17   hypervigilance, sensitivity to the surroundings.  And

18   testing administered by myself and Doctor Johnson

19   identified paranoia and sensitivity to the surroundings.

20         So given the weight of the available

21   information, in my opinion, supports a diagnosis of

22   Post-Traumatic Stress Disorder.

23   **Q.**  And the weight of the documents and the resources

24   you reviewed include all of the jail records and the DCC

25   records, her letters and the incident reports, correct?

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*
44

1     **A.**  That's right.  All of the information that I

2     reviewed including the testing, the reports, the

3     interview, her criminal history perhaps, it all is

4     consistent with this finding.  It was not inconsistent

5     with this diagnosis.

6     **Q.**  You mentioned criminal history.  Is it common or

7     uncommon for individuals with Bipolar Disorder or

8     Post-Traumatic Stress Disorder to involve themselves in,

9     first, some criminal behavior and, secondly, substance

10    abuse?

11    **A.**  According to the DSM Diagnostic and Statistical

12    Manual of Mental Disorders there is a high degree of

13    overlap between Post-Traumatic Stress Disorder and

14    substance abuse.  Quite often people with PTSD resort to

15    drug or alcohol use for the relief of symptoms.  Drug and

16    alcohol use in -- particularly extreme drug and alcohol

17    use is closely related with criminal behavior because much

18    of that behavior is criminal in and of itself and people

19    may involve themselves in criminal behavior to maintain

20    their substance use habit once it has developed.  And that

21    was my impression of Ms. Perry's history.

22    **Q.**  Other than Post-Traumatic Stress Disorder, you

23    diagnosed her with Bipolar Disorder, is that correct?

24    **A.**  That's right.

25    **Q.**  What was your findings?

*11-20677; United States of America v. Latoya Perry*

1      **A.**   Bipolar Disorder has a distinct set of symptoms and

2      particularly for a manic episode.  And the first is a

3      period of abnormally elevated expansive or irritable mood.

4      I found that Ms. Perry described expansive feelings when

5      she was on the street feeling like she was someone

6      special.  This is consistent with the grandiosity that was

7      also identified in the Personality Assessment Inventory.

8              She reported and evidenced a labile mood, often

9      laughing at inappropriate times and crying.  And these

10     mood swings are characteristic of a manic episode.

11             She -- one of the diagnostic criteria is also a

12     decreased need for sleep.  She was -- she reported a long

13     history problems sleeping.  And, in fact, records show

14     that she was prescribed Benadryl in the jail, Wayne County

15     Jail, to help her with sleeping.

16             A diagnostic criteria for a manic episode is

17     being more talkative or having pressured speech.  I

18     observed this during my interview with her and this was

19     also described in the treatment records that I had from

20     the Wayne County Jail.

21             Another diagnostic criteria for manic episode

22     involves a flight of ideas or racing thoughts.  Ms. Perry

23     reported having these experiences but also the

24     descriptions by Doctor Hinchman in the jail were

25     consistent with this as she was described as tangential

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

46

1   and rambling, speaking very fast.  This is characteristic

2   of a manic episode.

3           Another criteria is distractibility.  Apparently

4   Ms. Perry was observed to suffer from distractibility

5   because she was prescribed Adderall, a treatment for ADHD

6   while she was in the jail.

7           A diagnostic criteria for a manic episode

8   involves an increase in goal directed activities or motor

9   agitation.  There were two good examples of this that

10  support this criteria.  The first is the volume, nature,

11  and content of the letters that she wrote, and also the

12  findings in the MMPI II administered about Doctor Johnson

13  that found hypomania and increase in goal directed

14  activity.

15          Finally, the last criteria is excessive

16  involvement in pleasurable activities with a high

17  potential for painful consequences.  And I describe that.

18  This involves the risky sexual behavior, the involvement

19  with criminal behavior, the poor interpersonal boundaries.

20  In judging the validity of her symptoms, she had many

21  opportunities to exaggerate and did not do so.  And

22  therefore, I diagnosis her with Bipolar Disorder.

23  **Q.**  All right.  Other than the substance abuse, the

24  Bipolar Disorder, and the Post-Traumatic Disorder, were

25  there any other diagnoses of Ms. Perry?

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                    47

1    **A.**   What I provided were -- I picked up from the conduct

2    reports and her self-report and her demeanor with me that

3    she has personality traits that are histrionic.

4    Histrionic personal traits involve an intense need for

5    attention from others and a dramatic presentation,

6    interpersonal presentation.  That's picked up clearly in

7    the St. Clair County Jail records where she is constantly

8    demanding attention from the jailers.  And also paranoid

9    personality traits where she consistently perceives the

10   motivation of others as malevolent.  I think she has those

11   histrionic and personalty traits but it does not

12   constitute a diagnosis of a full personalty disorder.  And

13   this is viewed in light of Doctor Johnson's diagnosis of

14   Anti-Social Personality Disorder.

15   **Q.**   Let me stop you there.  Can you explain the

16   difference, if you can, between Bipolar Disorder and

17   Anti-Social Mood Disorder?

18   **A.**   There is some degree of overlap between Bipolar

19   Disorder and Anti-Social Personality Disorder in terms

20   of -- there is often a wide range of affect in persons

21   with this disorder.  There is the behavioral problems in

22   terms of substance use or interpersonal problems are seen

23   in both disorders.

24          One helpful factor in determining the

25   differential diagnosis of these two disorders are the

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

48

1   person's response to treatment with medication.  As Doctor

2   Johnson clearly stated in her report, a person with

3   Anti-Social Personality Disorder, this is a longstanding

4   and chronic condition that is resistant to treatment,

5   whether it's psychotherapy or medication.

6        So a person with Anti-Social Personality

7   Disorder, you would expect them to present consistently

8   despite treatment with medication, whereas a person with a

9   Bipolar Mood Disorder, this is a condition that is quite

10  often very responsive to appropriate treatment.  So you

11  would expect that a person with this condition, if they

12  are treated with appropriate medications, you would see a

13  decrease in their symptoms.  And there is information

14  about that issue in this case that helped me hold this

15  diagnosis even more firmly.

16  **Q.**  You indicated that Ms. Perry had been responding to

17  medications, or she was on medications while being

18  evaluated by Doctor Johnson?

19  **A.**  Well, I think that Doctor Johnson's report, we are

20  very fortunate to have that because it provides very

21  valuable information about the nature of Ms. Perry's

22  mental health condition and also the role that her mental

23  health condition plays if her behavior.

24        In my report, one of the conclusions was that if

25  Ms. Perry was consistently treated with the appropriate

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*
49

1    medications that she would have the potential to behave

2    appropriately, that she would be able to manage herself,

3    follow rules and do the things she was supposed to do.  On

4    extending that to say that following her period of

5    incarceration if she is treated appropriately with these

6    medications that she would have a higher potential to

7    behave appropriately in the community upon her eventual

8    transition.

9            Having Doctor Johnson's report and the

10   opportunity to compare Ms. Perry's demeanor and behavior

11   with how she behaved in California during those forty-five

12   days and how she behaved when treated with other

13   medications at the Wayne County Jail or in other

14   circumstances, it's essentially -- it provides a

15   comparison that is similar it a clinical trial in a

16   research study.

17           Specifically in the Wayne County Jail she was

18   not consistently medicated.  She was given at least ten

19   different medications that were changed frequently.  She

20   was given a stimulant medication for ADHD.  During that

21   time period, she was described as rambling, having loose

22   associations, pressured speech.  She had inappropriate

23   interpersonal behavior.  She was accused of sexual

24   misconduct.  She had they hypergraphia, the excessive

25   writing of letters.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

50

1          When I saw her in Midland in May of 2013 she was

2    taking two mood stabilizers and she showed some

3    improvement.  But she was still showing the pressured

4    speech and the labile affect.  She was laughing

5    inappropriately, crying at the wrong times.

6          About a week or two after I saw her the Midland

7    County Jail changed and gave her for the first time an

8    anti-psychotic medication which is quite often helpful in

9    managing a Bipolar Disorder, manic symptoms.

10          Finally, when she was at the MDC, the facility

11    in California where Doctor Johnson saw her, she was

12    finally getting appropriate treatment for Bipolar

13    Disorder.  She was taking anti-psychotic medication, a

14    mood stabilizing medication and two anti-depressants.  As

15    observed by Doctor Johnson during that time period, she

16    was following the rules.  She was socializing

17    appropriately.  She had good hygiene.  So she was doing

18    things the way that she should.

19          So these observations are very helpful because a

20    person with Anti-Social Personality Disorder would not

21    evidence a change in symptoms in response to medication.

22    But a person with Bipolar Disorder would.  Therefore, this

23    contrast is helpful in confirming in my mind the diagnosis

24    of Bipolar Disorder in place of the Anti-Social

25    Personality Disorder.  It also gives valuable information

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                    51

1    about the role that Ms. Perry's mental health condition

2    plays on her behavior, that is, that she, when not treated

3    appropriately, she does have difficulty regulating her

4    behavior.  So it provided more support in my opinion for a

5    diagnosis of Bipolar Disorder and Post-Traumatic Stress

6    Disorder.

7       **Q.**  There has been a Sentencing Memorandum drafted and

8    submitted to the Court by the Government that you had a

9    chance to review, is that correct?

10      **A.**  Yes.

11      **Q.**  And within that report and -- excuse me.  Within the

12   Government's Sentencing Memorandum he draws several

13   conclusions regarding the lack of validity of the medical

14   records, the self-reports reports and your procedures.  Is

15   that true?

16      **A.**  Yes.

17      **Q.**  Let's take those one by one.  He indicates that your

18   conclusions were cursory, lacking in depth because you

19   relied on uncorroborated statements by Ms. Perry.  Is that

20   true?

21      **A.**  No.  The basis for my opinion included her

22   uncorroborated statements.  It also included her

23   corroborated statements.  It also included the police

24   reports, medical records, and psychological testing.  It

25   was the consistency between these sources of data that

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                    52

1    informed my opinion. And that's the standard procedure for
2    a forensic evaluation.
3      **Q.**  And the criticism that you never observed Ms. Perry
4    without her knowing, without her knowledge, is that a fair
5    critique of your report?
6      **A.**  I never did have the opportunity to observe
7    Ms. Perry other than when I met with her for that four
8    hours and forty-five minutes.  I did, however, have
9    extensive descriptions of her behavior in the jail and in
10   the mental health treatment records.  So I had good
11   descriptions of that that informed my opinion.
12     **Q.**  So the several providers who had opportunity to
13   observe Ms. Perry, their notes and their records advised
14   you as to some of the self-report?
15     **A.**  Exactly.  The combination between what was observed
16   by the psychiatrist in the jail, what was observed in the
17   conduct reports from the jail, all of this in my opinion
18   had a consistency that was -- that spoke to problems
19   regulating behavior that was consistent with a diagnosis
20   of Bipolar Disorder.
21     **Q.**  Would you say that Ms. Perry attempted to present as
22   she wanted you to see her?
23     **A.**  That's a major factor in any forensic evaluation.
24   That's why looking at the constellation of symptoms that
25   she presents with is very important.  That's why the

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*
53

1    consistency between her self-report and other information,

2    the observations by others, is very important.

3              She did not take the road that many criminal

4    defendants do, which is reporting that they suffer from

5    every symptom.  Whenever you ask a symptom they might say,

6    I have that also.  They take the opportunity to

7    exaggerate.  She said no when she didn't have the symptom

8    and she said yes when she claimed to have the symptom and

9    her self-report, without having a background in mental

10   health treatment or a degree in psychology or psychiatry,

11   without a sophisticated understanding of what

12   Post-Traumatic Stress Disorder or Bipolar Disorder are,

13   the symptoms that she reported and the symptoms that she

14   exhibited were consistent with these diagnostic criteria.

15   And she did not report or exhibit symptoms that were

16   representative of schizophrenia or some other condition.

17   So, the consistency between her report, the behavioral

18   observations and all of the information led me to believe

19   that she gave an accurate representation of her true

20   mental health condition.

21   **Q.**  Of course that would include the testing, the

22   psychological testing which indicated she was not

23   malingering?

24   **A.**  That is that a big part of it.  And even more than

25   that, that that she was exaggerating, providing a fake

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

54

1    good profile nearly.  In Doctor Johnson, she had a

2    tendency to minimize problems.  So her self-report is

3    viewed in the context of her overall presentation.  And in

4    my opinion, that is consistent with these two diagnoses.

5    **Q.**  The Sentencing Memorandum by the Government also

6    indicates that you ignored inconsistencies in Ms. Perry's

7    story.  Is that true?

8    **A.**  One of the examples I believe was provided in the

9    Sentencing Memorandum was that Ms. Perry told Doctor

10   Johnson that she had been, in addition to the sexual abuse

11   by the uncle, that she had also been sexually abused by

12   two male cousins.  And in my interview, she did not report

13   the sexual abuse by the two cousins.

14           During my interview, she -- as I described, she

15   was having pressured speech, rapid speech, changing from

16   one topic to another.  She described the abuse by her

17   stepfather and her uncle, and in the flow of the

18   conversation, she quickly transitioned into a description

19   of her traumatic adolescence, surviving in a hostile

20   environment and then it transitioned into the abuse that

21   she -- in 2004 at the jail.

22           So I think that her omission of that fact is

23   more a factor of her rapid and disorganized thought and

24   speech pattern rather than -- you would think that if she

25   were going to exaggerate or malinger these problems she

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

55

 1    would have made sure to tell me about these problems.  And

 2    I think it's more a factor of overall disorganized

 3    cognitive presentation and her rapid thoughts.

 4        **Q.**  The Government criticized you for ignoring obvious

 5    reasons to doubt the validity of the DCC's diagnosis.  You

 6    did indicate that you had relied in part on the DCC

 7    records, is that true?

 8        **A.**  Yes.

 9        **Q.**  Was it the only -- clearly those were not the only

10    records you relied upon, right?

11        **A.**  That's right.

12        **Q.**  And, however, the Government focuses on the DCC

13    diagnosis and says that the psychiatric evaluation by Ms.

14    Perry was even more superficial than yours.  That isn't

15    true, is it?

16        **A.**  Well, I think that the diagnosis by DCC did not have

17    the benefit of much of the information that I do have --

18    the jail records and the legal documents.  They did not

19    administer psychological testing.  They did not have the

20    benefit of much of the information that I do have.  But it

21    did provide valuable information in that she had the

22    opportunity -- I considered the alternative hypothesis

23    presented by Mr. Martin that Ms. Perry was going to DCC

24    for the purpose of getting drugs to get high -- Xanax for

25    intoxication or to obtain financial benefit because there

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                      56

1    was a mention of Social Security disability application in

2    the records.

3              And it's my observation that this is

4    inconsistent with the data because although in March she

5    did request Xanax from the psychiatrist, she had

6    participated in over -- in three hours of interviews with

7    clinicians on February 17th.  And they made no record of

8    her asking for medication until, of course, at least two

9    weeks after that initial evaluation.

10             One of the case management social workers made a

11   note that he was going to initiate application for Social

12   Security disability benefits.  But there is no indication

13   that Ms. Perry initiated that.  And it's standard practice

14   for a community mental health provider when dealing with a

15   person with no income who they perceive to have mental

16   health issues, to initiate the proceedings for Social

17   Security disability benefits.

18             In addition, she, if she were motivated by

19   malingering, and it's noted that malingering was not

20   diagnosed by Doctor Johnson.  Malingering has been

21   diagnosed by no clinician that I am aware of with Ms.

22   Perry, a person with the intention of malingering would

23   have reported more problems.  Ms. Perry denied

24   experiencing psychosis.  She said she had never heard

25   voices.  A lot of what the DCC notes contain are

*11-20677; United States of America v. Latoya Perry*

 1    observations of the clinicians' interactions with her.

 2    They are describing how she behaved rather than her

 3    claiming mental illness.

 4          So it's my opinion these are a valuable source

 5    of information, a valid source of information, and a

 6    source of information that is consistent with the overall

 7    body of information that supports her diagnosis.

 8    **Q.**  One moment, please.  Okay.  With this diagnosis, do

 9    you have a prognosis for Ms. Perry regarding the

10    substantiation of her mental illness at this point in

11    light of that substantiation?

12    **A.**  Could you repeat the question, please?

13    **Q.**  Let me ask first.  Is someone with Bipolar Disorder

14    and Post-Traumatic Stress Disorder receptive to treatment?

15    **A.**  Yes.  Especially in contrast to a personality

16    disorder like Doctor Johnson proposed the Anti-Social

17    Personality Disorder that would not be responsive to

18    treatment.  And we have a concrete example of Ms. Perry's

19    amenability to treatment based on the observations when

20    she knew she was being watched and when she knew she was

21    not being watched in California.  Because at that point

22    she was prescribed an appropriate course of treatment for

23    a person with Bipolar Disorder.  She was prescribed an

24    anti-psychotic, a mood stabilizer and two medications

25    which provides information that she is available -- that

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                    58

1    she is capable of behaving in an appropriate manner

2    because Doctor Johnson described her as behaving in an

3    appropriate manner without the conduct reports that she

4    had at the Wayne County Jail when she was not

5    appropriately treated.

6           So it's my opinion that if she is given an

7    appropriate course of treatment in the future, that she

8    has a much improved prognosis.  In addition, she has

9    participated in periods of substance use treatment in the

10   past.  But it's my opinion that those would not have been

11   effective and were not effective because her mental health

12   condition was not concurrently treated.  It's my opinion

13   that -- I think it's one of the recommendations in my

14   report that she would have concurrent treatment of her

15   mental health condition so that She can be stabilized

16   emotionally and behaviorally during any period of

17   participation in a substance use treatment program and

18   that if both modalities of treatment are employed

19   concurrently, I think she has a much improved prognosis

20   and decreased risk of recidivism.

21   **Q.**   Okay.  Nothing further.

22           **THE COURT:**  We will take a five minute break.

23           (Recess from 12:05 p.m. until 12:15

24           p.m.)

25           **THE COURT:**  I believe Doctor Wendt was in the

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                              59

 1    process of completing his commentary, and I wanted to give
 2    you an opportunity to complete it.
 3    **BY MS. DWYER:**
 4       **Q.**  Doctor Wendt, had you completed the full response
 5    before we broke?
 6       **A.**  Yes.
 7       **Q.**  Okay.  I think he has completed it, your Honor.
 8               **THE COURT:**  Anything further from --
 9               **MS. DWYER:**  Yes, actually, if I may.
10    **BY MS. DWYER:**
11       **Q.**  Doctor Wendt, did Doctor Johnson have an opinion of
12    the medications Ms. Perry was taking while in California?
13       **A.**  Yes.  Doctor Perry's -- Doctor Johnson's report
14    indicated that Ms. Perry was prescribed in taking four
15    different medications while at the Federal Detention
16    Center in California, the first of which was Olanzapine.
17    Olanzapine was described by Doctor Johnson as a PTSD
18    medication.  The brand name for Olanzapine is Zyprexa.
19    It's an anti-psychotic medication, not a PTSD medication.
20    It's an anti-psychotic medication sometimes prescribed as
21    a mood stabilizer.
22               Now, the prescribing information from Eli Lilly,
23    that's the manufacturer of Zyprexa, defines it as an
24    atypical anti-psychotic.  And it's two conditions that
25    it's indicated for.  The first is schizophrenic, and the

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                        60

1    second is for acute treatment of manic or mixed episodes

2    associated with Bipolar One Disorder and the maintenance

3    treatment of Bipolar One Disorder.

4           Nowhere in the Eli Lilly information is it

5    described as a PTSD medication.  She was also prescribed

6    Topiramate. And that's the brand name Topomax.  Doctor

7    Johnson also described this as a PTSD medication.  Topomax

8    is an anti-convulsant medication prescribed as a mood

9    stabilizer for people with Bipolar Disorder.

10          Mr. Perry was prescribed Venlafaxine. The brand

11   name is Effexor.  Doctor Johnson also described this as a

12   PTSD medication.  However, it's an NSRI, Selective

13   Norepinephrine Re-uptake Inhibitor that's an

14   anti-depressant medication.

15          Finally she was prescribed Amitriptyline, the

16   brand name Elavil which Doctor Johnson described as a mood

17   disorder medication and that is accurate. This is a

18   tricyclic anti-depressant.

19   **Q.**  Based on her mischaracterization of the medications

20   Ms. Perry was taking, would that impact her conclusions in

21   her report?

22   **A.**  It's puzzling that she was describing Ms. Perry

23   taking PTSD medication when there was no -- where Doctor

24   Johnson said that she is not diagnosed with PTSD.  It

25   raises concerns about the validity of the conclusions, in

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*

61

1    my opinion.

2           Further, Doctor Johnson recommended, in addition

3    to not discontinuing the medication, she recommended that

4    as part of the sentence that Ms. Perry participate in

5    psychotherapy.  And view this in light of the primary

6    diagnosis of Anti-Social Personality Disorder that Doctor

7    Johnson said, these characteristics are unlikely to

8    substantially change regardless of treatment.  So if she

9    has this condition, why treat it?  It's not going to

10   respond to treatment.

11          But on page 22 of her report she recommends that

12   Ms. Perry participate in the R and R Program which is --

13   this is from her report -- is designed to address trauma

14   related mental health needs of female offenders.  And

15   that's, in my opinion, that's a contradiction of

16   recommending treatment that is not indicated by the

17   diagnosis provided.

18   **Q.**  So, Doctor Johnson, she recommended ongoing

19   treatment with the medication which whether she identified

20   them as anti-psychotics or anti-depressants or not, that's

21   what they were, right?

22   **A.**  That's right.

23   **Q.**  And she also recommended intensive psychotherapy,

24   correct?

25   **A.**  That's right.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Direct*
*Friday/March-7-2014*                                        62

1     **Q.**  And those recommendations would be inconsistent with

2     her diagnosis, in your opinion?

3     **A.**  Yes.  Particularly in light of the caveat in Doctor

4     Johnson's report that this diagnosis is unlikely to change

5     regardless of treatment.  Why make Ms. Perry go through

6     treatment that is not going to help? It's my opinion that

7     treatment would help.

8     **Q.**  So those findings are inconsistent?

9     **A.**  Yes.

10    **Q.**  Thank you.

11            **THE COURT:**  Mr. Martin?

12            **MR. MARTIN:**  Thank you, your Honor.

13            **THE COURT:**  Before we proceed, let me provide

14    some direction about our scheduling.

15            **MR. MARTIN:**  Yes, sir.

16            **THE COURT:**  We have not had lunch at this

17    point.  Let me declare that it is now 12:45 p.m. now.  At

18    1:30 p.m, well, if examination or Cross-Examination has

19    not been completed by that time, we will take an hour's

20    break and resume at that point.  But for now we will

21    continue until 1:30.

22            **MR. MARTIN:**  I will try to finish before

23    1:30 p.m.

24            **THE COURT:**  That's all right.

25                          -    -    -


*11-20677; United States of America v. Latoya Perry*

1                          **CROSS-EXAMINATION**

2   **BY MR. MARTIN:**

3      **Q.**  Doctor Wendt, you and I are familiar with each

4   other, is it fair to say?

5      **A.**  Yes, sir.

6      **Q.**  We've had a prior case that was the United States

7   versus Black case that you mentioned earlier when you

8   testified, is that right?

9      **A.**  Yes, sir.

10     **Q.**  And I think this is the third time I cross-examined

11  you.  Does that sound right?

12     **A.**  Yes, sir.

13     **Q.**  In all of those examinations I don't know that I

14  have asked you some details about your prior practice so I

15  want to cover some basics here.

16          I believe you testified that you were a forensic

17  psychologist for the State of Michigan?

18     **A.**  That's right.

19     **Q.**  And when did you leave employment of the State of

20  Michigan?

21     **A.**  October, 2006.

22     **Q.**  And thereafter did you immediately go into

23  essentially practicing psychology on your own?

24     **A.**  Yes.

25     **Q.**  And has that been your employment ever since?

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

64

1   **A.**  Yes.

2   **Q.**  Is it your sole source of income?  You, personally?

3   **A.**  Practice of psychology?

4   **Q.**  Yes.

5   **A.**  Yes, sir.

6   **Q.**  In your practice do you treat patients?

7   **A.**  No, sir.

8   **Q.**  Does your practice entirely consist of forensic

9   psychology?

10  **A.**  Yes.

11  **Q.**  And is it forensic psychology in both, in court

12  litigation or forensic psychology in other areas of life?

13  **A.**  It's evaluation of criminal defendants.  So it does

14  not involve civil matters or child custody matters.  It

15  involves the evaluation of criminal defendants.

16  **Q.**  Are those a mix of both state and federal criminal

17  defendants?

18  **A.**  Yes.

19  **Q.**  And can you give us a percent of how many federal

20  criminal defendants you have as opposed to state criminal

21  defendants?

22  **A.**  The vast majority are state defendants in Michigan

23  and Indiana.

24  **Q.**  Can you tell me how many times you have been

25  retained in a federal criminal case?

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

1    **A.**   I have performed approximately 40 to 50 cases in

2    Federal Courts or in federal cases in the Eastern and

3    Western Districts of Michigan and Northern District of

4    Hammond, Indiana.

5    **Q.**   How many times have you testified in a federal

6    criminal case?

7    **A.**   This would be the fourth.

8    **Q.**   And including that fourth, are you including the

9    Black case that we just talked about?

10    **A.**   Yes.

11    **Q.**   How many times did you testify in that case?

12    **A.**   Once for competency and once during the jury trial.

13    **Q.**   So there was one other prior case before the Black

14    case that you had testified in federal court?

15    **A.**   That's right.

16    **Q.**   And in that case, were you retained by the United

17    States Attorney's Office or by the defendant?

18    **A.**   I testified as my role at the Center For Forensic

19    Psychiatry because the defendant had concurrent state and

20    federal charges.  I was called by the US Attorney to

21    testify regarding the defendant's diagnosis.

22    **Q.**   And do you recall the name of the defendant or the

23    case name?

24    **A.**   Yes.

25    **Q.**   What was it?

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

66

```
 1     A.  Joshua Vicol, V-i-c-o-l, in the Western District of
 2   Michigan.  And I was -- performed that testimony as part
 3   of my duties at the Forensic Center.
 4     Q.  When you were still employed by the State of
 5   Michigan?
 6     A.  That's right.  So it would have been prior to 2006.
 7     Q.  So after you started your own practice and left the
 8   employment of the State of Michigan you then have
 9   testified a total of three times in Federal Court
10   including today?
11     A.  That's right.
12     Q.  And those two prior times in the Black case you were
13   retained by the defendant and not the US Attorney's
14   Office?
15     A.  Yes.
16     Q.  Have you ever been retained by the U.S. Attorney's
17   Office?
18     A.  No, sir.
19     Q.  Let me ask you about your billing.  I assume you
20   have been or expect to be compensated for your work in
21   this case?
22     A.  Yes, sir.
23     Q.  And what is your hourly rate?
24     A.  $150.
25     Q.  Does that rate apply equally to time spent in court
```

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

1   versus time spent outside of court?

2   **A.**  Yes, sir.

3   **Q.**  And approximately how many hours have you put in on

4   this case up to and including today's testimony?  Roughly.

5   I know we are not finished today.  Can you give me a rough

6   approximation?

7   **A.**  Between -- involving the evaluation, preparation for

8   testimony and court appearance, I believe it's between 20

9   and 23 hours.

10   **Q.**  Okay.  Thank you.  Your diagnosis in this case is

11   based on this book which is the Diagnostic And Statistical

12   Manual Of Mental Disorders, Fourth Edition?

13   **A.**  Yes, sir.

14   **Q.**  This is -- I referred to it in the past I think in

15   examining you as kind of the Bible for psychology.  But it

16   is considered the authoritative guide to diagnosing mental

17   illness, is that correct?

18   **A.**  It's the most widely used by psychologists.

19   **Q.**  And there is a number of mental illnesses and

20   disorders described in this book, correct?

21   **A.**  Yes, sir.

22   **Q.**  And the book lays out specific features or

23   characteristics of these mental disorders, correct?

24   **A.**  Yes, sir.

25   **Q.**  And there is an entry for Bipolar Disorder, is that

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

1    right?

2      **A.**   Yes.

3      **Q.**   I don't know if you have your book with you?

4      **A.**   I do.

5      **Q.**   I am looking at page 382.  There is an entry there

6    for Bipolar One Disorder and that was one of the diagnoses

7    you made of Ms. Perry in this case, is that correct?

8      **A.**   Yes.

9      **Q.**   And I'm looking down under Bipolar Disorder,

10   Diagnostic Features.

11     **A.**   Yes.

12     **Q.**   Do you see that there?

13     **A.**   Yes.

14     **Q.**   And it says, quote, the essential feature of Bipolar

15   One Disorder is a clinical course that is characterized by

16   the occurrence of one or more manic episodes or mixed

17   episodes, end quote.  Did I read that correctly?

18     **A.**   Yes.

19     **Q.**   And manic episodes and mixed episodes, these are

20   terms that are specifically defined earlier in the manual,

21   is that right?

22     **A.**   Yes.

23     **Q.**   So it is an essential feature of Bipolar One

24   Disorder that there be present a manic or mixed episodes,

25   right?

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

69

1      **A.**  Yes.

2      **Q.**  And if we turn to page 362, there is the criteria

3    for manic episode, is that right?

4      **A.**  Yes.

5      **Q.**  And this is the definition provided by the manual

6    for what a manic episode is, is that correct?

7      **A.**  Yes, sir.

8      **Q.**  And the first criteria is, quote, a distinct period

9    of abnormally or persistently elevated, expansive, or

10   irritable mood lasting at least one week or any duration

11   if hospitalization is necessary, end quote.  I did read

12   that correctly?

13     **A.**  Yes.

14     **Q.**  Now, you would agree with me that Ms. Perry was

15   never hospitalized for any manic episode, correct?

16     **A.**  No, she was never hospitalized.

17     **Q.**  So, therefore, in order to have a diagnosis of

18   Bipolar One Disorder there needs be a distinct period of

19   persistently or abnormally elevated, expansive, irritable

20   mood lasting at least one week, correct?

21     **A.**  That's right.

22     **Q.**  Now, I have the defendant's Presentence Report.

23   Have you reviewed that as part of your work in this case?

24     **A.**  Yes.

25     **Q.**  I am looking at page eight.  Do you have it?

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

70

1    **A.** Yes, sir.

2    **Q.** I'm looking at page eight, paragraph 29 and 30.  And

3    there are -- this is a section of the Presentence Report

4    that deals with the defendant's adult criminal

5    convictions.  Do you see that?

6    **A.** Could you repeat the page that you are on?

7    **Q.** Yes.  Page eight.

8    **A.** Okay.  Yes.

9    **Q.** The heading is, Adult Criminal Convictions?

10   **A.** Yes.

11   **Q.** I am looking at paragraph 29 and thirty.  Do you see

12   those?

13   **A.** Yes.

14   **Q.** They detail convictions and arrests -- well, they

15   detail on the left hand column arrests in 1995 that

16   subsequently resulted in convictions.  Do you see that?

17   **A.** Yes, sir.

18   **Q.** Can you identify for me when in 1995 the defendant

19   had a one week period of distinct abnormally and

20   persistently elevated expansive or irritable mood?

21   **A.** Can I define a specific week?

22   **Q.** Yes.  In 1995.

23   **A.** No, sir.

24   **Q.** Do you see paragraph 31, 32, where the defendant was

25   arrested in 1996 and subsequently convicted?  Do you see

*11-20677; United States of America v. Latoya Perry*

1   those?

2   **A.**  Yes, sir.

3   **Q.**  Can you identify for me the one week period in 1996

4   where the defendant had an abnormally elevated and

5   expansive or irritable mood?

6   **A.**  No.

7   **Q.**  If you look at the next page, page ten, there is an

8   entry for 1997. Can you identify the week during that

9   year?

10  **A.**  Yes.

11  **Q.**  In 1997, what was week?

12  **A.**  I don't know the week.

13  **Q.**  How about in 1998?  This is page ten on to page 11.

14  Was there a one week period that you can identify for the

15  Court where the defendant had an abnormally and

16  persistently elevated, expansive, or irritable mood?

17  **A.**  No.

18  **Q.**  If you look at the next page, page 11, page 12, page

19  13, page 14, and on to page 15, all detailing arrests in

20  2003.  Can you identify for the Court a one week period in

21  2003 where the defendant had an abnormally elevated,

22  expansive or irritable mood?

23  **A.**  No.

24  **Q.**  Page 15, paragraph 41 and 42, 2004.  Can you

25  identify a one week period during 2004?

*11-20677; United States of America v. Latoya Perry*

1    **A.**  No.

2    **Q.**  Page 16, 2006, can you identify a one week period in

3    2006?

4    **A.**  No.

5    **Q.**  Page 17, on to page 18, 2010, can you identify a one

6    week period in 2010?

7    **A.**  No.

8    **Q.**  This is back -- I am getting back to the DSM.  This

9    is the definition for manic episode on page 362.  The

10   criteria for manic episode includes -- and this is

11   subparagraph E -- quote, the symptoms are not due to the

12   direct physiological effects of a substance, e.g., a drug

13   of abuse, a medication, or other treatment, or a general

14   medical condition, e.g., hyperthyroidism, end quote.  Did

15   I read that correctly?

16   **A.**  Yes, sir.

17   **Q.**  Is it fair to say that the symptoms of the manic

18   episode cannot be caused by, among other things, an

19   illegal narcotic?

20   **A.**  That's right.

21   **Q.**  Turning back to the Presentence Report, I would like

22   you to focus on page 23, paragraph 79.  Paragraph 79

23   states, quote, Perry stated she first used alcohol and

24   marijuana at age 14.  Perry recalled prior to her arrest

25   she drank three times per week on average drinking four to

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

73

1    five drinks per occasion.  Perry explained she last used

2    marijuana in October, 2010 and that she had smoked

3    marijuana daily prior to her arrest, end quote.  Did I

4    read that correctly?

5    **A.**  Yes.

6    **Q.**  Paragraph 80, the last sentence.  During the

7    presentence -- quote, during the presentence interview,

8    Perry stated she first used cocaine at age 26 and last

9    used it in 2009, end quote.  Did I read that correctly?

10   **A.**  Yes, sir.

11   **Q.**  Paragraph 81, quote, Perry stated she illicitly used

12   prescription drugs, including Xanax and Valium.  The

13   defendant stated she first used Xanax following her 2004

14   rape which she last used in October, 2010.  Perry recalled

15   she first used Valium in 2005 and last used it in 2009,

16   end quote.  Did I read that correctly?

17   **A.**  Yes.

18   **Q.**  And in paragraph 82 on the next page, page 24,

19   states, quote, Perry recalled her first use -- she first

20   used Ecstasy at age 30 and discontinued using it at age

21   32.  Perry initially stated she experimented with heroin

22   on one occasion in 2006.  The defendant later disclosed in

23   the fall of 2010 she used heroin on a daily basis for

24   approximately one month prior to her arrest in October of

25   2010 due to the death of her brother's girlfriend, end

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

74

1    quote. Did I read that correctly?

2       **A.**  Yes.

3       **Q.**  So is it fair to say, Doctor Wendt, that during

4    2010, according to the paragraphs I just read, up to and

5    including October, which was when she committed the

6    offense that is at issue in this case, the defendant was

7    using simultaneously alcohol, Marijuana, Xanax, and

8    Heroin?

9       **A.**  I don't know if it was simultaneous, but I don't

10   disagree with the information contained in here.

11      **Q.**  Now, as part of your examination of the defendant

12   you examined records from the Detroit Central City?

13      **A.**  Yes, sir.

14      **Q.**  And I believe you indicated in your direct testimony

15   that the defendant was seen on February 17th, 2011 for the

16   first time at Detroit Central City.  Is that right?

17      **A.**  Can I look at the records to review my -- refresh my

18   memory?

19      **Q.**  Please do.  And I have copies here as well.

20      **A.**  I have got it here.  I believe the first contact

21   that I have documented is February 17th, 2011.

22      **Q.**  That is when she met -- excuse me -- met with a

23   social worker for in-take essentially, is that right?

24      **A.**  Well, the way I read it, she met with two different

25   social workers, one for a comprehensive assessment and

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

1    that was for an hour and a half.  Then after that, she met

2    with a different care provider the same day.  This was for

3    a related but separate, different purpose.  This was a

4    case management assessment.  So she had two assessments

5    there on February 17th, 2011.

6        **Q.**  And the comprehensive assessment was prepared by

7    who?  Which social worker?

8        **A.**  Ronald Williams, LL, MSW.

9        **Q.**  And the start time was 11:30 a.m.?

10       **A.**  What's documented is 11:30 a.m. to 1:00 p.m.

11       **Q.**  So an hour and a half?

12       **A.**  That's right.

13       **Q.**  That Mr. Williams, the social worker --

14       **A.**  Yes.

15       **Q.**  Does a social worker have the same training as a

16   medical doctor?

17       **A.**  It's my understanding that their training would be

18   different.

19       **Q.**  And does a social worker have the same training

20   generally speaking as someone with a Ph.D. in psychology?

21       **A.**  It's my understanding that the training would be

22   different.

23       **Q.**  And then the case management assessment that was

24   performed on that same day --

25       **A.**  Yes.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*                                                76

```
 1      Q.  -- February 17th, 2011, that was performed by
 2   Mr. Arnold Stafford, is that correct?
 3      A.  Arnold Stafford.  That's right.
 4      Q.  And on the signature line there it indicates that
 5   Mr. Stafford is also a social worker?
 6      A.  Well, the initials LBSW follow his name.
 7      Q.  And you understand that to indicate that he's a
 8   social worker?
 9      A.  I believe that is a certification for a social
10   worker.  That's right.
11      Q.  And it indicates that Mr. Stafford met with the
12   defendant from 1:30 to 3:00 p.m.
13      A.  1:30 to 3:00 p.m.  That's right.  On the 17th.
14      Q.  So that according to the records we have looked at
15   already, that would indicate that she met with two social
16   workers, a Mr. Williams and Mr. Stafford for a grand total
17   of three hours on February?
18      A.  That's the way I read it.
19      Q.  The 17th?
20      A.  That's right.
21      Q.  Did you ever contact Mr. Williams and Mr. Stafford
22   in this case?
23      A.  Did I contact them?
24      Q.  Yes.
25      A.  No, sir.
```

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

1    **Q.**  Do you have any information about their

2    qualifications, their training, their experience?

3    **A.**  No, sir, other than the initials on their signature

4    line.

5    **Q.**  And then on March 2nd, 2011, Ms. Perry met with a

6    medical doctor it appears, is that correct?

7    **A.**  Greg Washington M.D., that's right.

8    **Q.**  And he produced a report entitled Psychiatric

9    Evaluation, is that right?

10   **A.**  Yes.

11   **Q.**  And above the signature line on his report it

12   indicates that the start time was 9:00 a.m. and the stop

13   time was 9:15 a.m.?

14   **A.**  Yes.

15   **Q.**  So she had apparently a 15 minute meeting with

16   Medical Doctor Greg Washington?

17   **A.**  On March 2nd, 2011, that's right.

18   **Q.**  The date that she produced the Psychiatric

19   Evaluation, is that correct?

20   **A.**  That's the way I read it, yes.

21   **Q.**  And if we can go to the first page of that report or

22   evaluation, I should say, there is a section called

23   History Of Present Illness.  Do you see that there?

24   **A.**  Yes, sir.

25   **Q.**  And the first few sentences of that section reads,

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

78

1      quote, she has not had her medication in a while.  She is

2      asking for Remeron and Xanax, end quote.

3      **A.**  Yes, sir.

4      **Q.**  And further down, let me ask you this.  I think you

5      had testified that she, when she went to Detroit Central

6      City, it was documented in these reports that she was

7      experiencing a manic episode, is that right?

8      **A.**  I testified that she was -- her behavior was

9      described -- I will try to find -- if you go back to the

10     Comprehensive Assessment back on February 17th, page two

11     out of ten, she is having irritability, worthlessness,

12     hopelessness, panic attacks, decreased energy, verbal

13     aggression.

14     **Q.**  Do you understand those things to be things that the

15     social worker observed or things that the defendant

16     informed the social worker that she was experiencing?

17     **A.**  Generally those are things that are both observed

18     and reported.  It's likely that they were -- those

19     questions were asked and answered by Ms. Perry on that

20     date.

21     **Q.**  And these in your view reflect indications of a

22     manic episode or symptoms?  Hopelessness, things like

23     that?

24     **A.**  Hopelessness is associated with a mood disorder and

25     a major depressive disorder is one portion of Bipolar

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

1    Disorder.  The irritability is one of the -- if you recall

2    in the DSM4, is one of the primary criteria, criteria A on

3    362 is a distinct period of abnormally and persistently

4    elevated, expansive or irritable mood.

5    **Q.**  So you do think that those characteristics that were

6    reported by the social worker would support an indication

7    that she was experiencing at that time a manic episode of

8    some kind?

9    **A.**  I think that they are indications that she had

10   symptoms that are consistent with diagnosis of Bipolar

11   Disorder which was offered by the clinician on that date.

12   **Q.**  You mean the social worker?

13   **A.**  Yes.

14   **Q.**  Let me go back to the doctor, the medical doctor's

15   report if I may for a moment.  Back in the history of

16   present illness, the first paragraph, second to last line,

17   states, quote, no psychotic or manic symptoms.  She says,

18   subquote, sometimes I'm happy and sometimes I'm down, end

19   subquote.  Does not describe, subquote, happy, end

20   subquote, as consistent with manic symptoms, end quote.

21   Did I read that correctly?

22   **A.**  Yes.  And I view that in light of --

23   **Q.**  I didn't pose a questions yet, sir.

24   **A.**  Yes, sir.

25   **Q.**  Following paragraph you mentioned earlier that she

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*
                                                          80

 1    had been raped in 2004 and that you gave her report to you

 2    that she had been raped in 2004 weight as being true

 3    because you had seen indications that there was a

 4    settlement?

 5      **A.**  Her self-report was that there had been a

 6    settlement.

 7      **Q.**  And, therefore, you felt that that lended credence

 8    to the fact that she had, in fact, been raped?

 9      **A.**  If there was a settlement, it would lend credence to

10    that report.

11      **Q.**  So let's look at this second paragraph in the

12    psychologist's report if we could.  And the second

13    paragraph starts, quote, she first started taking

14    medication in 2004.  She states that a guard raped her.

15    She says that the person left and never came back.  She

16    received a 3,000-dollar settlement.  End quote.  Did I

17    read that correctly?

18      **A.**  Yes, sir.

19      **Q.**  Now, you, based on your training and experience, you

20    have heard of situations where a person is, claims to be

21    attacked or hurt in prison and the prison would settle a

22    case for a nominal figure, not because the attack or

23    injury actually occurred, but in order to avoid the costs

24    and time of litigation?

25      **A.**  True.

                *11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Cross*
*Friday/March-7-2014*

81

1      **MR. MARTIN:**  Your Honor, I have no further

2    questions for Doctor Wendt.

3                          -   -   -

4                    **REDIRECT EXAMINATION**

5    **BY MS. DWYER:**

6      **Q.**  Doctor Wendt, you were asked several questions

7    regarding the Presentence Investigation Report and the

8    defendant's use, Ms. Perry's use of alcohol, Marijuana,

9    Xanax, and Heroin, and I will include Valium in that list.

10     **A.**  Yes.

11     **Q.**  There's two things that you have discussed.  You

12   have discussed her traumatic childhood as well as her

13   mental illness.  Correct?

14     **A.**  Among other things, those are two of the primary

15   factors, yes.

16     **Q.**  So is it uncommon for someone who is not being

17   treated for mental illness to self-medicate?

18     **A.**  It's very common for a person with a mental illness

19   to use drugs or alcohol as a form of self-medication.  The

20   differential diagnosis of any mental health condition

21   involves looking at whether it's triggered by a substance

22   use, medication use or some medical factor such as a head

23   injury.  I think there is valuable information available

24   as to whether Ms. Perry's mental health condition is

25   triggered by or directly attributable to substance use.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

1          I have read many conduct reports about Ms. Perry

2    in the jails.  There is no indication that she has been

3    abusing drugs or alcohol that I am aware of.  She has,

4    however, experienced mental health symptoms in the jail in

5    the absence of substance use.

6          In terms of differential diagnosis, if it was

7    only due to the substances, you would expect that these

8    symptoms would remit when she is in a period of sobriety

9    while incarcerated, and that was not the case.  So it

10   lends more support to the diagnosis as being valid, in my

11   opinion.

12   **Q.**  If someone is choosing to self-medicate rather than

13   participate in a mental health treatment in therapy, will

14   the self-medication relieve the symptoms of Bipolar

15   Disorder or Post-Traumatic Stress Disorder?

16   **A.**  It can exacerbate the symptoms and it can

17   temporarily relieve the symptoms.  It can relax a person.

18   But it can cause more problem that make the condition

19   worse.  It really varies from case to case.

20   **Q.**  You are aware that Detroit Central City is a mental

21   health facility, correct?

22   **A.**  Yes.

23   **Q.**  And I believe they may have rehab there as well,

24   correct?

25   **A.**  I am not certain of all of the services that they

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

1    provide.

2       **Q.**  But it is a mental health facility?

3       **A.**  Yes.  That's my understanding.  It's a community

4    mental health, comparable to CMH providers statewide, I

5    would say.

6       **Q.**  Okay.  First of all, she was -- she was sent to DCC

7    by the Court as part of a mental health diversion,

8    correct?

9       **A.**  That's my understanding, yes.

10      **Q.**  And at DCC, because it is only a community mental

11   health treatment facility, isn't it fair to say that those

12   social workers would be trained in mental health?

13      **A.**  It's my understanding that social workers are

14   trained in mental health.  I don't know the exact specific

15   training that a social worker goes through.  But it's

16   common practice in my review of treatment records over

17   several years that it's very frequently in community

18   mental health settings that there is a collaboration

19   between social workers and psychiatrists and case managers

20   or nursing to address the mental health needs of their

21   clients which was consistent with what I read in this

22   report, these reports from DCC.

23      **Q.**  You were asked questions about Ms. Perry's report

24   that she was happy and that the definitions or the ways

25   she had described that mood of happy, the social worker I

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*                                            84

1    think had found that that was not consistent with manic

2    episode.  What is your opinion of that?

3        **A.**  Well, I would view it in light of how she described

4    herself with Doctor Hinchman.  She said I'm not -- I've

5    never had psychosis and I never had mania.  I am not

6    psychotic or manic.  But Doctor Hinchman described her as

7    rambling, loose associations.  These are the catch phrases

8    that psychiatrists use when a person is manic.  Loose

9    associations, rambling, tangential.  So even though Ms.

10   Perry was saying, no, I don't have those problems, Doctor

11   Hinchman was writing, I see these problems.

12       **Q.**  All right.

13       **A.**  So, the fact that she says, look, I'm not too happy,

14   when viewed in the context of the overall presentation and

15   my understanding of Bipolar Disorder, the development and

16   course of it over a lifetime, that the sentence that was

17   picked out by Mr. Martin certainly would not rule out a

18   diagnosis of Bipolar Disorder.

19       **Q.**  You were asked several questions about 2003 and 2004

20   regarding whether you could identify a specific week in

21   those years where a manic episode was displayed.  And you

22   were unable to state a single week.  Is that right?

23       **A.**  That's right.

24       **Q.**  And does that impair your opinion at all?

25       **A.**  In diagnosing any individual, unless you are --

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

85

1     unless they are in-patient, they are hospitalized and they

2     are observed 24 hours a day or if you have 24 hour

3     surveillance of the person, especially with a person in

4     the environment that Ms. Perry was in where access to

5     resources is limited in comparison to other communities,

6     the fact that you can't identify which seven days she had

7     these symptoms during a certain year doesn't rule out the

8     diagnosis at all.  In fact, if you refer -- I'm going to

9     refer to page 386 that describes of the DSM4 TR that

10    describes the course of Bipolar Disorder in a person.  It

11    says -- this is at the top of page 386.  The average age

12    of onset is 20 for both men and women.  It would be

13    unusual for a person who is 37 or mid-thirties when she

14    was treated to be their first episode.  Bipolar One

15    Disorder is a recurrent disorder.  More than 90 percent of

16    individuals who have a single manic episode go on to have

17    further episodes.

18            So, viewed in light of an understanding of the

19    natural course of a Bipolar Disorder and the information

20    that I have available that supports my opinion that this

21    is a valid diagnosis, would indicate that her pattern of

22    behavior during the time periods, even those years where

23    there is no documented seven day period of elevated,

24    expansive or irritable mood, wouldn't rule out that

25    diagnosis.  If fact, her reckless and impulsive behavior

*11-20677; United States of America v. Latoya Perry*

```
 1    during those time periods is consistent with this

 2    diagnosis.

 3                 MS. DWYER:  Nothing further.

 4                 THE COURT:  Mr. Martin, anything further?

 5                 MR. MARTIN:  No, your Honor.

 6                 THE COURT:  All right.  You are excused.  You

 7    may step down.

 8                 THE WITNESS:  Thank you, your Honor.

 9                 THE COURT:  Earlier in talking with counsel,

10    I had indicated we would take a break at 1:30 p.m. for an

11    hour.  But in as much as the counsel have concluded their

12    examination of Doctor Wendt at an earlier time, we will

13    stop now and we will resume, and I would ask the parties

14    to be back in their chairs at one hour from now and that

15    means -- help me out.  What time would that be?

16                 MR. MARTIN:  2:30, your Honor?  2:25?

17                 THE COURT:  You are the official clock

18    watcher.

19                 MR. MARTIN:  Okay.  I will make sure Ms.

20    Dwyer is here punctually.

21                 THE COURT:  We will resume at the time

22    designated by Mr. Martin.

23                 MR. MARTIN:  Thank you, your Honor.

24                 (Recess from 1:30 p.m. until 2:30 p.m.)

25                 THE COURT:  Please be seated.  Ma'am, do you
```

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

1    have any additional witnesses to call?

2              **MS. DWYER:**  No, I don't, your Honor.  Thank

3    you.

4              **THE COURT:**  Mr. Martin?

5              **MR. MARTIN:**  No, sir, I do not.

6              **THE COURT:**  Do either counsel have argument

7    with regard to the evidence that has been presented --

8    placed on the record?

9              **MR. MARTIN:**  I do have some argument, your

10   Honor.

11             **MS. DWYER:**  Yes.  However, I anticipate

12   conducting that during allocation.

13             **THE COURT:**  I wanted to give to you both an

14   opportunity to help me or to advise me as to what in your

15   opinion the sentence should be.

16             **MS. DWYER:**  Yes.

17             **THE COURT:**  And that is something that I do

18   not and should not and will not avoid.  So I want to give

19   to you the opportunity to express your views with regard

20   to the Presentence Investigation Report, to the sentencing

21   that I should impose.

22             **MS. DWYER:**  Your Honor, I misunderstood.  I

23   thought you were asking if we had argument about that

24   testimony.

25             **THE COURT:**  No.  That may be if you desired

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*                                    88

1    it to be incorporated into your, quote unquote, Closing

2    Argument.

3                **MS. DWYER:**  Okay.  Thank you, your Honor.

4                **THE COURT:**  So that -- because we have gone

5    through a number of different hoops since this morning,

6    let me ask the question that may have been asked already.

7    Are there any -- is there any opposition or any comments

8    on the accuracy of the Presentence Investigation Report?

9                **MR. MARTIN:**  Still none from the Government.

10               **MS. DWYER:**  None from the defense.

11               **THE COURT:**  I also want to make certain that

12   we give to Ms. Perry an opportunity to speak to the Court

13   if she so desires.  And let me address that issue right

14   now.

15           Ms. Perry, you have been sworn as a defendant in

16   this matter.  The question I pose to you, is there

17   anything that you want to say to me before I impose a

18   sentence upon you?

19               **THE DEFENDANT:**  Yes.

20               **THE COURT:**  Let me say to you that if in the

21   event you do want to speak to the Court, that if there is

22   an objection by your counsel, you should await for a

23   decision by the Court.  All right.  Go right ahead.

24               **THE DEFENDANT:**  Do you want me to go now?

25               **MS. DWYER:**  Your Honor, would you like us at

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

89

1    the podium?

2                    **THE COURT:**  No.  Stay right there.

3                    **THE DEFENDANT:**  I would just like to thank

4    the Court for everything that they have done for me.  I

5    know this was a difficult case and I want to thank you for

6    reading all the letters that I have written you and taken

7    time out, consideration and taken time to read those.

8                    **THE COURT:**  Let me say as a postscript that

9    whenever I get communication or communications from a

10   party, I read it at least twice so that I want to make as

11   certain as I possibly can to do that which I would expect

12   and hope that a Judge would do in the event that I was --

13   the circumstances were different.  But go right ahead.

14                   **THE DEFENDANT:**  I apologize for so many

15   letters.  Even when you told me not to write, I felt like

16   I needed to write you more because I was -- I'm going

17   through a lot of things and I felt like I had no one else

18   to talk to.  And so that's the reason for me writing you.

19        When I first got locked up, I didn't have no

20   understanding of why I got locked and why these things

21   happened to me so I just prayed about it and asked God for

22   some understanding and what's when I first got accusations

23   and got put on lockdown.  I was alone by myself for 90

24   days the first time.  And when I was alone for those 90

25   days the first time, all I had was my Bible in my hand.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

90

 1   When I had my Bible in my hand I learned a lot because God

 2   let me read the word and he showed me a lot and gave me

 3   some understanding of life and understanding of why I was

 4   here.  And it was a blessing for me to come here and to

 5   spend these three years while I was incarcerated, and

 6   through the sufferings that I went through it drew me

 7   closer to God.

 8            And also I learned a lot about myself that I

 9   didn't know about and helped me correct myself on know who

10   I was because for so long and so many years I have been

11   out there on the streets and my mind wasn't right and I

12   didn't know what to do in a lot of situations.  And since

13   I spent time here these three years going through things I

14   have been through and spending time alone on lockdown

15   because I spent a lot of time on lockdown by myself, I

16   believe that was for a special purpose from God because it

17   drew me closer to him.  I have learned a lot about the

18   word.  I have learned a lot about myself and I learned a

19   lot about people.  And I am thankful today and I'm blessed

20   today.  And my main focus now today is just to get back

21   home and help my mother and help my children and do what

22   is right in life because I don't ever want to live the

23   life that I lived before.

24            And I just want to the thank you again.  I want to

25   thank Lisa, the courts for everything she has done for me.

*11-20677; United States of America v. Latoya Perry*

1   And I'm just asking you for help if you can help me

2   because I never did have the help that I needed.  And

3   before I got locked up I did ask the last Judge to help me

4   and that's when he sent me to Detroit Recovery Project to

5   help me.  And those was my main goals was to do right and

6   change my life and do right so I could get my kids so they

7   don't have to be victims and go through what I went

8   through, especially my youngest son who is now in

9   juvenile.  But I am thankful that he is in juvenile

10  because he's safer right now.  And my other son is in

11  college.  He's listening to everything I am telling him to

12  do.  And my daughter, she helped my mother out.  And I

13  just want to make it known so I can try to help them so

14  nothing would happen to them.  That was my main concern,

15  was to help my family and my children.

16       That's all I would like to say is thank you for

17  listening.  And the last time I was here I cried so much

18  when I was talking to you because I was so much

19  emotionally hurt and I never had nobody listen to me.  And

20  I just felt kind of like love when you was listening to me

21  so that's what made me cry so much.

22       But medications that I have been on has helped me

23  in the past.  But a lot of medications they put me on I

24  have been on so many because I didn't like the way they

25  was making me feel because I didn't feel I needed those

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*                                    92

```
 1    heavy doses of medication to try to maintain my life.  And
 2    I haven't been on no medications for over three weeks now
 3    and I feel myself kind of more main focused a little more,
 4    too, as well because I haven't been on those medications.
 5    And I got compliments from officers at Midland County
 6    because I just left that jail Monday.  They told me I was
 7    doing real good because I wasn't pressing the emergency
 8    button and not disrespectful.  But I never have been
 9    disrespectful but I don't disrespect people and I try show
10    them the respect, inmates as well.
11           Also when I left Monday I was moved Monday to
12    Sanilac County and they sent me back to downtown before I
13    went back to Sanilac and they treated me very horrible
14    when I went back there.  One officer told me to get in
15    this room and he slammed the door in my face away from the
16    general population, and things like that just make me feel
17    some type of way.  And that's what hurts and that's what
18    gives me pain and anxiety because of the way I had been
19    treated.  And that is the only reason why I was writing
20    letters and that's the only reason why I tried to tell my
21    lawyer because I felt like I should have been treated this
22    way, especially when I do good and try so hard to do good.
23    And the more I tried to do good the more I was getting
24    accused of things.  I was called all types of things in
25    the jails and they gave me a reputation with inmates, also
```

*11-20677; United States of America v. Latoya Perry*

1    about officers talking to inmates, and that's what make

2    they lie on me and feel that they can do whatever they can

3    do or say whatever they can say to get me in trouble, and

4    it worked.

5              So that's what makes me write to you as well to

6    let you know because I want you to understand me and where

7    I'm coming from and let you know I am not that type of

8    person.

9              So, with that, that's why you got the last letter.

10   And like I said, I apologize for so much trauma that's

11   been in my life, but that's something else that I learned,

12   how people in the world is, but I still show love to

13   people and to the community no matter how evil they are.

14   I still try to help them or correct them if I can because

15   this is what I have learned.  And that's it.

16             **THE COURT:**  To what extent, if at all, has

17   your relationship with God brought you closer to your

18   children?

19             **THE DEFENDANT:**  I teach them -- my son who

20   went to Michigan State, he do Bible studies at the school

21   that he's at.  And he know a lot about God, too.  And he

22   will be 20 years old this Monday.  And I am very proud of

23   him because he listens to everything I tell him.  He study

24   the word, too, and every school he go to he teaches God's

25   word.  That's what I was doing when I was in the jail.  I

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*
94

```
 1     was doing Bible studies.  I get the girls, we get in a
 2     circle and we pray together and read Scriptures about God
 3     and at the end we discuss what we learned about God
 4     because that makes me feel better and helped me.  I told
 5     them even though I am in the situation that I am in, I
 6     told them how many deaths I had in the family and I told
 7     them that it still makes me feel at peace and I feel okay.
 8     And it makes me feel good when I do right.  If I do
 9     something wrong, I repent and ask God to forgive me even
10     if I say something respectful to somebody or if I do
11     something wrong or if an inmate don't want to clean up, I
12     ask, if they trying to get smart with me, and I say, I'm
13     just trying help you, you know, keep yourself clean if I
14     can.  I not nobody's parent.  I'm not nobody's mother.  I
15     am not a rock boss because that's what they always want to
16     call me just because I don't want to be the only one
17     cleaning up.  And, you know, they just lost.  It's A lot
18     of people lost out here in the community.  And if I can, I
19     want to try to help the community so they won't have to go
20     through what I went through and experience the things that
21     I experienced because it's a lot of children that don't
22     have a lot of love in their life and don't have no
23     guidance like I didn't have no guidance and the things I
24     went through.
25              So the things I experienced, I try to help someone
```

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

 1    if I can, but it's all I can do.  It's up to them if they

 2    want to listen or not, but a lot of people have listened

 3    and a lot of people care and appreciated me talking to

 4    them about God and showing them and helping them if they

 5    poor and they don't have nothing.  And especially addicts.

 6    When I see addicts come in, I look at them and I can't

 7    believe that I was out there with them or even trying to

 8    get them something like that to sell.  That's not

 9    something I would do again because I would never want to

10    get somebody to destroy their live to make them look the

11    way they was looking or take them away from their kids.

12    Probably a lot of them lost their children.

13         So that is, you know, what I learned since I have

14    been locked up.  I see so many people coming in and on

15    heroin and their addiction and everything and that has

16    made me want to change my whole way of thinking.  I have

17    to change my mind and my mind has been changed since I

18    have been locked up.  And going through the sufferings has

19    helped me go through that. It helped me to be stronger in

20    life to deal with things that is coming my way because

21    they say that in the Bible, too, when you are into God you

22    will be treated badly and the enemy will attack you.  And

23    that's what I experienced, but I am okay with it.

24              **THE COURT:**  To what extent, if at all, have

25    you been or will you be a role model to your children?

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

 1            **THE DEFENDANT:**  Yes, sir.  I have been, even
 2    though all the times I have been incarcerated, when I
 3    called them at home and talked to them I said, make sure
 4    you all go to school so you all don't want have to
 5    experience what I experienced and what your father
 6    experienced and they always listen to me because they love
 7    me very much and I love them.
 8            The only one I have a problem with is my youngest
 9    son.  The last time he was here he was 13.  He's 16 now
10    but he had no guidance.  No one in the house has shown him
11    no love.  He didn't have a mother figure.  I'm not there.
12    And that's his main hurt because his father was murdered
13    last year.  I am in here, and then my father passed away
14    which my father was like a dad to him because my mother
15    and father adopted my kids.  So by him having all those
16    losses in life I understand how he feel because he out
17    there smoke marijuana.  He out there hanging with gang
18    members.  And I try to tell him to stay away from these
19    type of people but it's hard for him to listen to me, and
20    he been through so much hurt and pain.  And don't nobody
21    understand it. That's why I asked my sister or brother can
22    they pick him up and take him to their house and show him
23    some love and attention because my mother buy him clothes
24    and she buy him everything he want but that's not showing
25    no love.  He don't want no material things.  He needs some

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

1    attention and some love because I'm not there, his father

2    not there and he lost his grandfather.  I understand these

3    things but it seem don't nobody else out there understand.

4    And my mother say she do show him love which I understand

5    because she keep buying him stuff but she is grieving

6    herself because my father is gone, my brother was murdered

7    and then I'm in here.  So she lost too much.  She is hurt,

8    too, and she was grieving through liquor.

9            And so I just have -- that's when I have to go to

10   God and pray very strongly and ask him to protect them and

11   bless them for me until I can get home and try to show

12   them the guidance that I learned since I have been in

13   here.  And he got grazed by a gun.  By the grace of God he

14   didn't get hit. They said if the bullet would have hit him

15   in such a way he would have been paralyzed. So that's how

16   I know that God is listening to my prayers.  I just ask

17   Him to keep him protected and away from those kids because

18   I don't want him in the wrong car at the wrong place at

19   the wrong time and get a lot of jail time because he's

20   lost and he don't know.  But I understand what he is going

21   through.  And he might need mental health because while

22   he's a juvenile, my mother told me that he asked that he

23   get something to help him sleep.  And she said, no.  She

24   thought he was crazy because she don't want him to have

25   nothing like that.  And I tried to explain to her that he

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*                                    98

 1   might need something like that.  I was like, because

 2   that's what I take when I'm here.  I was like, when I

 3   first got locked up, I was so hurt I felt like I didn't

 4   even want to live no more because it was too much pain for

 5   me.  And that's how I felt.  I was like I would rather be

 6   in a mausoleum where my brother.  At least he at peace.

 7           But that's when God let me hear his voice.  So I

 8   was telling her, she said that his probation officer

 9   called and said that he is real evil. He don't want to

10   take showers.  He not eating.  And I was like that's

11   because they don't understand what he going through.  I

12   was like, he might need to talk to a doctor or something.

13           So I don't want him to go through what I went

14   through.  And he supposed to get out April 24.  And I'm

15   just afraid.  I don't want him to get back out there and

16   get back -- go back astray and get back out there to the

17   streets and then something happened to him.

18           So that's my main focus, trying get home to my

19   family and my kids so that I can get my baby and raise him

20   like a mother that I was supposed to because I didn't get

21   that chance to raise him when he was younger because I was

22   out on the streets.  And then I wasn't mature in the way I

23   am today.

24           And he's also in a colostomy bag when he was born.

25   And I know he had to have certain things in him and I

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*                                     99

1    don't know if that's the reason he don't want to take

2    showers around boys or I don't know what is going on with

3    him, but I know he needs someone to talk to.  And it's

4    just my kids I am worried about and my mother and family

5    what I always been worried about.  I'm always worried

6    about my family.

7             I know I was out there in the streets doing the

8    wrong thing.  For a long time I didn't have nowhere to go.

9    I was staying in the streets and hotel rooms and things

10   like that. I didn't want to be there.  And even when I was

11   using drugs I didn't let myself be no crackhead because I

12   was embarrassed to go home to look like that or ashamed.

13   But it's still something that I tried and it's something

14   that made me feel like it took the pain away.  But that's

15   still not something that I want to be. I want to be a

16   mother to my children.  And when my grandmother was alive

17   then still I would go take her groceries, my mother's

18   groceries and things like that.  So that's where my heart

19   is.  I don't have a negative heart.  I don't disrespect

20   people.  My behavior, I know how to control myself.  That

21   is the most important thing is learning how is control

22   myself and knowing how to think and do positive.  And I am

23   willing to do anything you ask me to do to prove that to

24   the courts.

25             **THE COURT:**  Anything else?

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

1       **THE DEFENDANT:**  That's about it.

2       **THE COURT:**  All right.  Thank you.

3       **THE DEFENDANT:**  Thank you.

4       **THE COURT:**  Ms. Dwyer?

5       **MS. DWYER:**  Thank you, your Honor.  First of

6   all, I would like to comment on what Ms. Perry just

7   explained to the Court.  She indicated to you that she has

8   been off medications for about three weeks.  She

9   essentially says she thinks she is doing better now

10  without her medications because she feels more clear

11  headed.

12      I would indicate to the Court that listening to

13  her just now was evidence of manic behavior.  She was --

14  had rambling speech.  She was difficult to interrupt.  She

15  was paranoid.  She is to this minute convinced that the

16  sheriffs deputies in every jail are plotting against her.

17  And she had quick changes just now in different subjects.

18  She went from her son to deputies to her mother to -- and

19  she was sort of all over the map a little bit during her

20  allocution.

21      So I want to bring this to the Court's attention

22  because Ms. Perry indicated to me she is having a hard

23  time frankly wrapping her head around the mental illness.

24  Though she recognizes that something was wrong when she

25  was out there all these years, I don't know whether she

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

 1    has been able to wrap her head around it.  It's not just

 2    what happened to you as a child.  It's not just this using

 3    of drugs, but there is something more, with more depth.

 4    Okay.

 5            That being said, I still think that if she were

 6    ordered to participate in substance abuse treatment and

 7    therapy and take medications as appropriate, I do believe

 8    that she would be responsible to that order.  I think that

 9    she would cooperate with taking medications.  I think she

10    has had a bad experience at the Wayne County Jail where

11    her medications were being changed and switched so often

12    that she probably didn't know whether she was coming or

13    going.  However, I think she is in the process of

14    accepting what this is.  And I am sure the Court is aware

15    that a lot of people have a difficult time accepting their

16    own mental health.  In fact, Doctor Wendt, his testimony

17    indicated that both his evaluation and Doctor Johnson's

18    evaluation, that they both indicated that she was not

19    malingering and that if anything, she denied certain

20    feelings or prospects even though the objective tests

21    revealed that she, in fact, did suffer from certain

22    feelings and mood swings and what not.

23            So I think she is doing the same here today.  I

24    think she is in denial a little bit about her mental

25    illness.  And I think she is -- I mean, it's going to take

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

102

1    her a minute, there is no doubt, to really understand that

2    she has a mental illness and that's it's a chemical

3    imbalance, that she didn't do anything wrong and that she

4    is still a beautiful person in the eyes of God.

5         The other thing that is more important is when

6    reading the Government's Sentencing Memorandum, and this

7    was the one I'm referring to that was filed last --

8    July 19th, 2011.  That Sentencing Memorandum is as

9    important as the Supplemental Sentencing Memorandum.  The

10   supplemental dealt with criticisms of Doctor Wendt.  And I

11   believe Doctor Wendt has substantially responded to all of

12   those criticisms.  However, the initial Sentencing

13   Memorandum indicated -- really addressed the purposes of

14   sentencing.  And I want to comment on that.

15        The Prosecutor indicated that Ms. Perry has not

16   been deterred because of prior lenient sentences.  And my

17   suggestion here is that, your Honor, there is case law

18   that says if someone has not had a severe punishment in

19   the past, like if they have been on probation, that in

20   those cases, a lengthy sentence has quite an impact on

21   that person, and a lengthy sentence certainly doesn't have

22   to be a guideline sentence in this case.  Seven years is a

23   lengthy sentence.  I mean, her children will be, you know,

24   30 by the time she gets out with seven years.

25        The other note I want to make is that specific

*11-20677; United States of America v. Latoya Perry*

1    deterrence to her would be participation in the drug

2    treatment program in prison.  Specific deterrence to her

3    would be mental health treatment while she is in prison.

4    Therefore, she would have this, you know, hopefully, the

5    tools when she is the process of reentry into the

6    community, to have a stable understanding of both her

7    mental illness and the substance abuse issues and the

8    extraordinary amount of work it will require of her to

9    address these from this point forward.  This point

10   forward.  It has to be a life long commitment.

11        With regard to Ms. Perry's specific offender

12   characteristics, it is so, so -- it breaks my heart to

13   think that children are treated like this all the time.

14   Ms. Perry, I'm sure this Court is aware, comes from one of

15   the worst neighborhoods in Detroit.  It's steeped, steeped

16   in drug culture and violence.  I think the only prospects

17   or options for people in that neighborhood are to either

18   deal drugs or possibly work as a single cash money check

19   changing place.  There just aren't options.  And when you

20   are poor, you can't go anywhere.  And when you are poor

21   and you flee your house because you are being beaten so

22   bad and you have sex with someone to make sure the other

23   people in the neighborhood don't harm you, and then you

24   end up selling drugs at 13 on the streets and soliciting

25   males, that -- it's almost impossible for me to wrap my

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

104

1   head around that a little 12 and 13 year old at that point

2   had already gone through so much.

3        The fact that she was pregnant at 15 should be no

4   surprise given that history.  The fact that she used drugs

5   throughout her life should be no surprise given that

6   history.  The fact that we hear now that she is mentally

7   ill should not be surprising to anyone either.

8        Doctor Wendt, in my opinion, he was excellent.  He

9   really broke down the difference between the diagnosis of

10  Post-Traumatic Stress Disorder and Bipolar Disorder rather

11  than Doctor Johnson's diagnosis of anti-social behavior or

12  personality disorder.  And even if the Court is on the

13  fence about whether this is Bipolar or anti-social

14  behavior, we do know that the medications that she was

15  taking while at the detention center in California helped

16  because she was doing well.  And they were anti-psychotic

17  drugs and anti-depressants versus anything else that she

18  had taken up to that point despite the fact that she has

19  been in jail for three years.

20       So I think that he was right when he said that is

21  almost like a clinical study which is not getting adequate

22  supervision and treatment for her mental health.  She

23  writes the letters.  She participates in hypergraphia.

24  She gets into verbal and physical confrontations at the

25  jail.  She is confrontational with both inmates at times

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*
105

```
1    and she is confrontational with the staff.  But that is
2    consistent, again, with manic behavior because of the high
3    level, the extreme level of irritability suffered by
4    bipolar individuals.
5         The diagnosis of Post-Traumatic Stress, as far as
6    I know, that is not difficult for me to understand.  And I
7    don't know that anyone is disputing that as much as the
8    bipolar disorder.  And the reason they -- I'm sure this
9    wants to be disputed is because my opinion and Doctor
10   Wendt's opinion is that Ms. Perry will rehabilitate once
11   she is appropriately treated.  If it's anti-social
12   behavior, then it looks like she may not be able to be
13   receptive to treatment.
14        My heart tells me she will be receptive to
15   treatment, that she is willing to accept what it will take
16   in this life long commitment.
17        Now, I think it's also important to note as I did
18   in my Sentencing Memorandum that the career offender
19   guidelines overstate her criminal history as well as the
20   guidelines.  I indicated in this report that in my
21   Sentencing Memorandum, rather, that six of her points came
22   from marijuana charges, paraphernalia charges, simple
23   possession of cocaine.  In fact, the five points for the
24   felonies -- of the five points for the felonies, one was a
25   possession of cocaine and one was a delivery of cocaine
```

*11-20677; United States of America v. Latoya Perry*

1    which, of course, is unacceptable.  All of these are

2    criminal behavior.  However, they are examples of being

3    attributable to not only her developmental history but the

4    neighborhood she was residing in, as I said, has limited

5    options.

6         Ms. Perry indicated to Court that it was very

7    important to her to be able to bring groceries to her

8    mother and to other family members.  She bore that.  Just

9    like in her personal history she -- after her father would

10   beat her mother so bad that Ms. Perry thought she was

11   going to die, she would find her mother crying and hiding

12   in the basement.  And when she was unable to calm her

13   mother, she took it on herself to run the house and to

14   take care of her younger siblings.

15        It makes sense that that is where she -- her mind

16   is at up to this point.  In fact, Doctor Wendt indicated

17   that she tested with a very high level of empathy.  We

18   don't see a lot of high level of empathy around here.  But

19   she did test with a high level of empathy.  And I think

20   that's worthy, too, that she still, somewhere she knows

21   it, that God has revealed to her that she has it in her

22   heart to be a better person.  She cares about people and

23   in that way and for that reason I also don't think that

24   you can turn your back on the idea that she's not a person

25   that will benefit from rehabilitation.  I believe she

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*
107

1    will.

2         But the career offender guidelines, as I said,

3    overstate her criminal history because of the number of

4    marijuana and drug paraphernalia and cocaine.  And all of

5    this accounts for 11 points of her criminal history of 15.

6    Of 15 points, there is that.

7         The other point I wanted to mention to you is that

8    she did cooperate with the Government.  She sat down with

9    Mr. Martin.  This was prior to my time of representing

10   her.  Andrew Wise had represented her during the proffers.

11   But it's my understanding that she did proffer, that she

12   did -- in fact, officers from Detroit homicide and the ATF

13   came and met with her at the jail.  So she did that

14   without counsel even being present.  And whether or not

15   her assistance qualified as the substantial assistance

16   required for the Government's 5K motion is not the only

17   issue here.  You may consider her attempts to cooperate

18   and assist the Government as her commitment to transgress

19   no more.

20        The guidelines in this case are excessive given

21   the circumstances.  She is convicted of a sale of almost,

22   but not even, 32 grams of crack cocaine.  She is -- she

23   suffers from a mental illness.  And I quoted adequate

24   support and authority for this Court to recognize that our

25   Supreme Court and our Sixth Circuit both endorse variances

*11-20677; United States of America v. Latoya Perry*

1    for mental illness and for severe emotional and childhood

2    abuse.  I believe that authority is right on point with

3    this situation we have here with Ms. Perry, and I hope

4    that you will consider that.

5          In addition, it's interesting to me that I had

6    used the word horrifying in describing the abuse she

7    suffered as a child because when Doctor Wendt tested her,

8    and this is what was revealed in the objective testing,

9    was that she had deep seated feelings of fear and horror.

10   And when he said the word, horror, I have to say that I

11   have never seen that come up with a psychological profile

12   either.  But if she is reliving this abuse everyday in her

13   mind and if she is trying to self-medicate, it's not going

14   to work for her.  She needs the Court's help.  She needs

15   some resources.  But I can't stress enough, seven years

16   can be a lifetime opportunity to change.  That's

17   contemplated by the Rule Eleven.  And I ask the Court to

18   consider that.

19         There is a case in the 6th Circuit in USA versus

20   Harriston that recently said that given the small amount

21   of crack cocaine that was -- which the defendant pled to,

22   given the potential for rehabilitation, given that in that

23   case a five year sentence promoted general deterrence but

24   also that specific deterrence would be satisfied by the

25   programs for mental health and substance abuse.  So I feel

11-20677; United States of America v. Latoya Perry

 1     that that case is on point.

 2            And I will leave the Court with a final quote that

 3     I thought was -- I think you would like to hear.  In

 4     Griffin v. United States -- excuse me -- Griffin v.

 5     Illinois, which is a United States Supreme Court case,

 6     Justice Frankfurter had said, that the Court is to

 7     consider that the possibility of rehabilitation has

 8     returned as a forceful and mitigating factor because it's

 9     a goal of punishment.  That goal cannot be served if the

10     defendant can look forward to nothing beyond imprisonment.

11     Hope is a necessary condition of mankind for we are all

12     created in the image of God.  A Judge should be hesitant

13     before sentencing so severely that he destroys all hope

14     and takes way all possibility of a useful life.

15            Your Honor, please don't sentence her to more.

16     Please sentence her sufficient, but not greater than

17     necessary to meet these goals.  Thank you.

18            **THE COURT:**  Thank you.  Mr. Martin?

19            **MR. MARTIN:**  Yes, your Honor.  I agree with

20     Ms. Dwyer who makes very good arguments always, of course,

21     that rehabilitation is an important goal of sentencing and

22     providing hope for a defendant is important.  But balanced

23     against that, of course, is your responsibility not only

24     to deter this defendant, but to deter others.  And I

25     believe in this case, driving my view of this case is,

 1   quite frankly, protecting the public and incapacitating

 2   the defendant for a significant period of time so she

 3   cannot continue to commit crimes as she has done so

 4   prolifically in the past.

 5        I first want to address the issue of mental

 6   health.  Obviously this issue is contested.  I think the

 7   Court is sitting as a fact finder at this sentencing

 8   hearing on the mental health issue, that if that is, in

 9   fact, the case then I believe that you first must find if

10   you are going to mitigate her sentence at all for any kind

11   of mental health, to find by a preponderance of the

12   evidence which is the standard for fact-finding at

13   sentencing hearings, that she, in fact, has a mental

14   health illness.

15        And I would submit to you that that burden has not

16   been met in this case.  First, let me address Doctor

17   Wendt.  You know, Doctor Wendt diagnosed the defendant

18   with Bipolar Disorder which has, as I pointed out in my

19   Cross-Examination, the essential feature -- that is the

20   quote from the Diagnostic Manual -- the essential feature

21   is a one week or more period of mania.  He could not point

22   to one week from the 1990s all the way up to 2010 of her

23   ever having a period of one week of mania.  And he tried

24   on redirect to say, well, you really didn't need to

25   identify the week.  Of course you do.  Why?  So that you

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*                              111

```
 1    can investigate whether other things may have caused the
 2    type of manic symptoms someone has -- speaking rapidly or
 3    changing the subject or crying or being very happy.
 4           And during the course of the Cross-Examination,
 5    one very obvious explanation for any type of manic
 6    behavior on the part of the defendant, footnote, if she
 7    even has had any manic behavior, would be her chronic
 8    substance abuse.  During Cross-Examination I think I
 9    identified three or four controlled substances which she
10    was taking simultaneously just before she walks into the
11    Detroit Central City and is diagnosed for the first time
12    in her life with having a mental illness, this being a
13    women who has essentially spent, since age 20, almost her
14    entire life in and out of the Criminal Justice System.  It
15    strikes me as highly doubtful that a person who has had
16    the number of arrests and convictions and sentences and
17    probation and parole as this defendant would for the first
18    time be diagnosed with a true mental illness at age 37.
19           I believe that her diagnosis when she went to
20    Detroit Central City was predicated on her admitted
21    serious daily drug abuse.  When she went there, was she
22    expressing sadness or happiness or pressured speech
23    because she had this previous undiagnosed mental illness?
24    Or was it because she was high on heroin or drunk or high
25    on marijuana or taking her Xanax, abusing her Xanax pills?
```

*11-20677; United States of America v. Latoya Perry*

1          Doctor Wendt would have you believe, no, no, no.

2     It's this undiagnosed mental illness that only he and this

3     other medical doctor who examined her for 15 minutes,

4     never reviewed any medical records of any kind, only they

5     were able to discover the truth.  I just find that so

6     incredible.

7          Also with respect to Doctor Wendt, I asked him

8     questions about his experience testifying in Federal Court

9     and I was surprised to hear that the cases that I have had

10    with him are basically the extent of his experience

11    testifying in federal court with the exception of one

12    other.  The case I had with Doctor Wendt before was United

13    States versus Black.  It was a case in front Judge Rosen

14    from a couple years ago.

15         Doctor Wendt testified at a competency hearing

16    claiming that defendant was incompetent to testify.  The

17    Magistrate Judge disagreed, found the defendant competent.

18    He went through the entire trial process, the appellate

19    process without ever having any competency issues

20    whatsoever.

21         Then at trial, Doctor Wendt offered another

22    opinion, that the defendant was legally insane.  That

23    theory was rejected by 12 unanimous jurors.  In addition,

24    Doctor Wendt wanted to testify about certain matters in

25    the trial.  I'm not going to get into exactly all the

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*
113

1     details, but he wanted to testify about certain subject

2     matters related to the hereditary nature of the

3     defendant's claimed mental illness.  And Judge Rosen ruled

4     that he could not testify to those opinions because they

5     did not meet the Daubert standard, the basic standard in

6     Federal Court for a, quote unquote, expert to render an

7     opinion.  And these are just some of the descriptions that

8     Judge Rosen offered about Doctor Wendt's opinion.

9                 **MS. DWYER:**  Your Honor, I know you read those

10    in his Sentencing Memorandum but --

11                **MR. MARTIN:**  I would like to highlight them

12    if I may.  I did not interrupt her presentation.  I ask

13    for the same consideration.

14                **MS. DWYER:**  We don't have a transcript.  We

15    don't have a transcript.

16                **MR. MARTIN:**  I will provide one.  Of course,

17    I cited to the case number in my pleading.  They are

18    available for defense counsel to obtain at any time.  But

19    I do have a transcript here which I am going to hand to

20    her.  And I even tabulated the portions that are relevant.

21          So Judge Rosen described Doctor Wendt's

22    methodology as quote, attenuated, scattered, weak, and,

23    quote, stacking one supposition upon another supposition

24    leading to a supposition as a basis for a diagnosis, end

25    quote.  He didn't allow Doctor Wendt to testify on that

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

114

1  subject.  He did testify at trial and his theories were

2  soundly rejected by the jury.

3       In addition, that case went up on appeal to the

4  Sixth Circuit.  A decision just came out in January of

5  this year.  I'm handing defense counsel a copy of that

6  opinion, again, also publicly available.  And here is what

7  the Sixth Circuit had to say about the evidence of

8  insanity:  Quote, the evidence overwhelmingly establishes

9  end quote, that the defendant was not insane.  Quote,

10  there was, quote, compelling evidence, end quote, that the

11  defendant was malingering, meaning faking.  And that the

12  Sixth Circuit says, quote, on this record we do not see

13  how he could possibly have met his burden of proof,

14  meaning his burden of proof to establish that he was

15  mentally insane.

16       This is a person that Doctor Wendt testified under

17  oath was mentally insane.  And the evidence was so

18  overwhelmingly against that position that even the Sixth

19  Circuit affirmed the conviction and published a published

20  Opinion on the topic.

21       Let me also just address one other thing that has

22  come up in this case, and that is the psychological test.

23  Doctor Wendt gave the defendant a psychological

24  assessment -- yes, Personality Assessment Inventory.  This

25  is a psychological test.  There has been lots of

*11-20677; United States of America v. Latoya Perry*

1    discussion how the test shows this and the test shows

2    that.

3            This Personality Assessment Inventory is what is

4    called a self-report test.  What that means is the

5    defendant basically provides the answers to a multiple

6    choice test.  These psychological tests are hardly rock

7    solid in terms of their predictive power.  I'm not saying

8    that they are not a tool that psychologists shouldn't use

9    or they are one data point to have, but they are far from

10   the type of reliable scientific testing that we have come

11   to expect in the realm of physical science.

12           And just to illustrate this point, I want to point

13   the Court to -- and I just found this on-line the other

14   day.  This is a published study by two researchers in

15   Australia.  It's called -- the title of the study is The

16   Examination Of The Reliability And Validity Of The

17   Personal Assessment Inventory.  That is the test that

18   Doctor Wendt gave to the defendant.  It was published in

19   the Journal Of Psychopathology And Behavioral Assessment.

20   I'm not going to go into great detail on this, but I want

21   to the point out that this was a study that was done

22   involving three groups of individuals, a, quote unquote,

23   normal group of people, meaning people basically taken off

24   the street or from college, a group of people who were

25   schizophrenic who were selected because they were patients

1    at a mental health hospital in Australia.  And then a

2    group of people who were alcoholics who were taken from a

3    rehabilitation clinic.  All of these groups took the

4    Personality Assessment Inventory, and according to this

5    study, the Personality Assessment Inventory was able to

6    correctly identify the schizophrenics 70 percent of the

7    time which, of course, means that 30 percent of the time

8    they are missing the schizophrenics.

9            But here is the real salient point on that is that

10   when the alcoholics took the test, the test showed that

11   the alcoholics were schizophrenic 76 percent of the time.

12   So it misdiagnosed people who were or had a history of

13   abusing substances as schizophrenic.  And the researchers

14   speculate the reason that is is people who are abusing

15   substances often manifest the same types of symptoms as

16   people who are mentally ill, just as is the case with Ms.

17   Perry.  These psychological tests do not deserve the same

18   type of weight that I think medical tests in the physical

19   realm have.  And so that was a key part of Doctor Wendt's

20   opinion and I don't put much weight on it myself.

21           You do have though before you a report from a

22   Bureau of Prison's psychologist, Doctor Johnson, who

23   examined the defendant for a forty-five day period, much,

24   much longer than Doctor Wendt's four and a half hour or

25   four hour and forty-five minute examination.  She reviewed

 1    not only her own interactions with the defendant but she

 2    had the opportunity to interview people who interacted

 3    with the defendant when the defendant -- when the

 4    psychologist wasn't with the defendant, meaning other

 5    prison guards.  She reviewed jail tapes of the defendant

 6    calling family members.  And she found no evidence

 7    whatsoever either at the time she was at the facility or

 8    any time before to diagnosis the defendant with a mental

 9    illness.  Instead she diagnosed her with this anti-social

10    personality which is essentially a set of character traits

11    that are not susceptible to rehabilitation.  People with

12    anti-social personality don't follow rules.  They don't

13    conform to society's norms.  They engage in risky behavior

14    not necessarily because they are mentally ill, because

15    that's who they are.  That's their personality. If that is

16    who they are and that is their personality, no amount of

17    drugs or medication or therapy is really going to change

18    that.  And that is what Ms. Perry has.  She is

19    anti-social.  She is not mentally ill.

20            When Ms. Perry and Ms. Dwyer talk about all of

21    this history of abuse and all of these horrific things

22    that have happened to Ms. Perry, from day one I have been

23    sounding the alarm that I would like to see some

24    corroboration for these statements, something, a family

25    member to come forward and say, I saw that abuse.  I was a

1   recipient of this abuse like she was.  Or I knew the

2   person who was abusing her.  It was a stepfather in her

3   own home where other people lived.  There has never ever

4   been any person, document, anything, not a scintilla of

5   corroboration for what she is saying.

6          And while it may seem harsh to say -- to

7   disbelieve someone who is claiming they were treated in

8   such a horrible fashion, I think it's our obligation,

9   given this defendant's record and her obvious motivation

10  to fabricate here today, to ask for something more than

11  just her uncorroborated statement that these things

12  happened to her.

13         Doctor Wendt never demanded any kind of proof.  He

14  never made any effort to try to corroborate it.  He just

15  accepted it as true.  I am unwilling to do that because I

16  don't believe that her criminal conduct is all just a

17  function of some uncorroborated abuse or some

18  uncorroborated mental illness.  I think her criminal

19  conduct is a result of her own choices, her situation, her

20  decisions.

21         And when you look at her criminal record, it is

22  atrocious.  I was looking just doing some math as Ms.

23  Dwyer was talking and looking at my Sentencing Memo from

24  2012, and she has 19 separate criminal arrests.  She then

25  has another 15 or 16 arrests that led to convictions,

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

1    separate arrests that led to convictions, for a total of
2    34 separate encounters with law enforcement that led
3    either to an arrest and no charges or an arrest and
4    conviction -- 34 starting at age 20.  And at the time I
5    wrote this she was 37 years old.  That is -- I've never
6    seen a defendant with that kind of track record.  It's
7    like two a year, every two years or every -- at least
8    twice a year she is getting arrested or arrested and
9    convicted.  It's quite remarkable.  And of the 15 criminal
10   convictions she has, eight of those involved drugs.
11       And I would like to respond to something that Ms.
12   Dwyer argued.  And that is, that, hey, look, a lot of
13   these drug related convictions aren't really that serious,
14   you know, conviction for drug paraphernalia, that kind of
15   overstates the serious nature of her criminal activity.  I
16   strongly disagree.  And I want to point out, for example,
17   this is just one of many, but I will point this one out,
18   she had a conviction in 2003 for possessing drug
19   paraphernalia, crack pipe and rolling papers in a hotel
20   room.  But that wasn't whole story.
21       In 2003 a parent called the police to report that
22   their 14 year old daughter had run away from Indiana, a
23   place that the defendant had previously sold drugs and had
24   a conviction for escape.  The parents believed that their
25   daughter was in a hotel room in Michigan with the

*11-20677; United States of America v. Latoya Perry*

1    defendant and other people.  Police officers went to the

2    hotel room and the defendant answered the door.  The

3    defendant lied to the police and told them the 14 year old

4    girl had left the room thirty minutes earlier with an

5    unknown male. The police officers went into the room and

6    they found the 14 year old hiding in the bathroom and it

7    was inside the room they also found the crack pipe and the

8    rolling papers.

9           So, yes, she was convicted of possessing drug

10   paraphernalia.  But if you are the parents of that 14 year

11   old girl, this case means a whole heck of a lot more than

12   just some paraphernalia in a hotel room.  I found it

13   somewhat ironic that the defendant is telling you now that

14   she wants to do all of these good works and wants to help

15   children and her children and things like this when she

16   has a history of involving young people in the same types

17   of criminal conduct that she now says got her on the path

18   to where she is today.

19          That 14 year old girl wasn't the only one.  In

20   2004, a 16 year old girl who did not return from home was

21   reported to the police and she was found in a residence

22   with the defendant who had drugs in her possession and the

23   defendant was subsequently convicted of drug possession.

24   And then the most disturbing of all, frankly, to me is

25   that when the defendant was arrested and charged with

*11-20677; United States of America v. Latoya Perry*

1   possessing crack cocaine in 1996 in a home in Indiana, the

2   police found that she had hidden at least some of the

3   crack cocaine in the pockets of her own two year old

4   child.  The father of children myself, we all know how

5   dangerous, incredibly dangerous that would be because two

6   year old children, they put all sorts of things in their

7   mouth.  Crack cocaine could have -- that's like giving a

8   small child matches or a weapon or something.  I mean,

9   it's so irresponsible.

10          And I have to say that given that she has -- her

11  drug related crimes have impacted not only her own

12  children but other children is, again, a reason I believe

13  it's time for this Court to really be the first Court to

14  impose a sentence that recognizes the very strong need to

15  protect society as well as deter the defendant.

16          I'm also not persuaded by the defendant's claim

17  that she -- the picture she paints of herself of a person

18  who is now a devout Christian and has reformed her ways

19  and has seen the light, I have a stack of her jail records

20  of her conduct in jail while she has been awaiting trial

21  and sentencing in this case, and they show -- they paint a

22  completely different picture of what the defendant is like

23  when she is not in front of you.

24          And I just want to point out that the most recent

25  one is from February of this year where she is written up

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

1    at the Wayne County Jail for essentially touching another

2    inmate's breasts.  She had earlier had difficulties with

3    this inmate and it culminated in this assault.  I'm just

4    going to read to you from a portion of an officer's report

5    regarding the defendant.  It says, quote, Inmate Perry

6    thinks because she is a federal inmate she does not have

7    to comply by the rules.  It appears every time I work this

8    unit she has a problem with another inmate.  It appears

9    that Inmate Perry likes to bully certain inmates.  While

10   writing this report, Inmate Perry approached the deputy

11   station stating, subquote, I'm not going downtown, end

12   subquote.  Inmate Perry was instructed to leave the desk.

13   Inmate Perry left and continued to stop and talk on the

14   catwalk which she knows is a violation.  Inmate Perry

15   likes to challenge authority to see how far she can go,

16   end quote.

17        And just looking at records from the St. Clair

18   County Jail, these are just some choice quotes.  Quote,

19   inmate seems to be playing games again, end quote.  Quote,

20   inmate continues to be rude and disrespectful to officers,

21   end quote.  Quote, inmate continues to play games

22   regarding her medical care, end quote.  Quote, inmate

23   wants to argue and be confrontational with officers, end

24   quote.  Quote, inmate continues to try to get deputies to

25   fight with her, end quote.  Quote, inmate continues to ask

*11-20677; United States of America v. Latoya Perry*

1    for another mat to try to make officers feel sorry for

2    her, end quote.  Quote, inmate keeps demanding that

3    officers do things for her.  She constantly tried to get

4    officers upset, end quote.  Quote, during medical pass,

5    inmate was playing the subquote, pick a pill, subquote,

6    game refusing to take a med, then saying she will take it.

7    And it goes on and on and on with her.

8          With Ms. Perry, she is never -- she is never

9    responsible. It's always somebody else's fault.  It's

10   always the officers.  They are the ones picking on her.

11   She never does anything wrong.  It's always the other

12   inmates.  They are the ones picking on her.  She never

13   does anything wrong.  All of this criminal activity of

14   hers, year after year after year, the arrests, the

15   convictions, everything.  It's not her fault.  It's this

16   previously undiagnosed mental illness.

17         I don't buy it for one second, your Honor, and I

18   would ask that you impose a very serious sentence in this

19   case.  You know, Ms. Perry is here today because she sold

20   what I would describe as a fairly significant amount of

21   crack cocaine.  This was, just referring to my Sentencing

22   Memorandum, this case actually involved three sales -- a

23   controlled purchase for Ms. Perry on September 22, 2010,

24   of 19.68 grams for $900, that is crack cocaine, as well as

25   a sample of heroin.  A September 27th, 2010 sale to a

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

1   Confidential Informant of crack cocaine weight 31.75 grams
2   for $1,350.  And then a sale on October 11 of 1.41 grams
3   for $150.  You're talking about someone who sold in a
4   very, very short period of time nearly 50 grams of crack
5   cocaine for well over $2,000, not some low level minor
6   street dealer.
7        I would also point out that her last conviction
8   for drug trafficking at the state level before she was
9   convicted of this offense was in 2006 when the defendant
10  was arrested after she delivered one large piece of crack
11  cocaine and three packets of heroin to a Confidential
12  Informant who is working on behalf of the Dearborn Heights
13  Police Officers.  In fact, the defendant violated her
14  probation and her parole in that case numerous times.  She
15  was actually on parole at the time she committed the
16  instant offense.  So she is involved not just in selling
17  crack cocaine but heroin.
18       And I wanted to point out to the Court lastly that
19  these are very serious offenses.  I have been saddened to
20  see recent news articles and other news media reports
21  about the very serious consequence of heroin use in our
22  district and around the country.  I just gave defense
23  counsel a very recent news story from the Detroit News
24  from earlier this month entitled Heroin Addiction Hits
25  Hard Across Michigan.  It describes how heroin use is on

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*
                                                        125

1      the rise rather dramatically around the country and in our

2      district.  I'm just going to give you some statistics on

3      this.  Quote, heroin used nationally increased 79 percent

4      from 2007 to 2012.  Heroin overdose deaths went up 45

5      percent between 2006 and 2010.  There were 158 heroin

6      related deaths in Michigan from 2007 to 2011.

7              This is a further quote.  And this is a quotation

8      from Special Agent Rich Isensten (ph) with the Drug

9      Enforcement Administration.  Quote, people who start using

10     opiate pain killers whether they are hydrocodone or

11     Oxycodone products, they get hooked on those pills which

12     are very expensive when you buy them on the street.  And

13     people who can no longer afford that addiction typically

14     switch over and start using heroin because they buy hits

15     of heroin for much cheaper.

16             Then an individual named Raj Metha (ph), a

17     recovering heroin and interventionist at Serenity Therapy

18     Center in Rochester Hills said heroin is one of the most

19     difficult drugs to kick.  Quote, 25 percent of people who

20     try it once become addicted, he said, end quote.

21             This is -- this is a drug that, I don't think it's

22     an overstatement to say it's destroying people's lives and

23     it's chronic in our district right now.  And she was

24     involved in pushing this poison to our citizens.  And not

25     only was she involved, she has been doing this type of

        *11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

126

1   thing literally for decades.  And I ask the Court to

2   please impose a sentence that is serious enough to protect

3   the citizens of our district, to deter her from ever doing

4   it again and to deter others.  And that is why I am asking

5   for a within guideline sentence of 210 months.

6           **THE COURT:**  Thank you.

7           **MS. DWYER:**  Your Honor, may I respond?

8           **THE COURT:**  All right, briefly.

9           **MS. DWYER:**  Yes, I will do that.  I will just

10  quickly note the points.

11          I think it's interesting that Mr. Martin says

12  decades because if she had not started selling when she

13  was 13 or 12 years old to save her life on the streets,

14  then she would be dead now.  So when he's talking decades

15  of a 37 year old women, it's 25 years most which she was

16  very young and traumatized.

17          Ms. Perry does not blame everything on everyone

18  else.  If you note, she stood up -- and you're right.  She

19  spoke about the jail staff but she didn't mention anything

20  about her personal history and developmental years.  It's

21  very painful for her.  For the Prosecutor to suggest that

22  because it's uncorroborated that Ms. Perry has just

23  fabricated her entire history, I think is, first of all, I

24  know he says it was uncorroborated.  He has never once

25  asked me to present a witness.  Her sister, we can put her

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

1    up right now if he wants corroboration about the abuse in

2    the family.  And if the Court would like to hear that

3    because you feel it's necessary, we will put a witness up

4    right now.

5          The fact that the PAI is a self-report test and

6    may be imperfect this report out of Australia, we don't

7    know what the slant of this report is.  As of now, the

8    objective PAI test is widely used in America and is

9    considered to be the most -- one of the most valuable

10   tools in evaluating an individual.

11         And it should be noted finally in terms of this is

12   that, you know, we keep -- Mr. Martin wants to focus you

13   on, well, that test, you know, and I have this report out

14   of Australia.  Doctor Wendt, you can't buy that because he

15   relied on this test.  Doctor Wendt did not rely only on a

16   test that apparently in Australia they don't care for, but

17   he also relied on records from four jails from the DCC and

18   from all of these letters that she had written, his

19   interview with Ms. Perry.  He used a great fund of

20   resources to reach his opinion.  And after he issued an

21   opinion, he continued to receive materials, additional

22   records, and he continued to review those.  And I've asked

23   him every time, is there anything about these records that

24   would change your opinion?  And it was always, no.  If

25   anything, it strengthened his opinion.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

128

1          The fact that the jail -- and we go through and

2     quote all of the ways she behaved at the jail, frankly are

3     consistent with the Wayne County in-take and the

4     observations of Doctor Hinchman at the Wayne County Jail.

5     Doctor Hinchman is very much aware that Ms. Perry had

6     psychological problems and she -- the entire time at the

7     Wayne County Jail she was prescribed medications as well

8     as at St. Clair and Midland.  The suggestion that she is a

9     difficult inmate without the context of the fact that she

10    had been determined to be psychologically unstable, put on

11    the floor at the Wayne County Jail for psychological

12    mental health offenders, Wayne County took steps.  It's

13    hard to hear and to have read some of the things that Ms.

14    Perry did because I don't see that in her.  But I do feel

15    there are times, as Doctor Wendt indicated, where she is

16    not in control of her own behavior.  She is, as he said,

17    high levels of irritability and these are -- and choices

18    that are unusual for not only societal norms but for an

19    individual.

20          **THE COURT:**  I am going to ask you to complete

21    your comments in a couple more minutes.

22          **MS. DWYER:**  Okay.  All right.  Okay.  So, the

23    fact that he points out that she was fine for 45 days in

24    California without the context that she was on an

25    anti-psychotic medication is unfair to Ms. Perry.  The

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*
129

```
 1    fact that we haven't seen a one week of continuity and
 2    mania by Doctor Wendt is unfair.  Many examiners, almost
 3    every examiner has only the ability to go to the jail for
 4    a few hours to make an examination.  And time and time
 5    again, this is sufficient to put together a conclusion.
 6              There is no reason to doubt Doctor Wendt's
 7    integrity.  He was cautious with each answer to this Court
 8    and I would imagine the Court found him to be honest and
 9    truthful as a clinician.  The 34 encounters with law
10    enforcement mentioned, several of them were driving
11    misdemeanors.  Most of them seemed to be possession of
12    marijuana.  Now, it doesn't change the fact that her
13    guidelines, 11 points of 15 points in her guidelines, are
14    driven by simple possession of either cocaine or marijuana
15    or narcotic paraphernalia.  And I ask the Court to
16    consider that because it does overstate her career
17    offender guidelines.  Nothing further.
18              **THE COURT:**  Thank you.  The record in this
19    case indicates that the defendant, Latoya Lavanda Perry,
20    entered a plea of guilt to Count Two of the Superseding
21    Information pursuant to a Rule 11 Plea Agreement.  That
22    proposed guilty plea was accepted by the Court.  The Court
23    at that time took the so-called Rule 11 Plea Agreement
24    under advisement.  Significantly as it appears in this
25    case the Rule 11 Plea Agreement between the parties is as
```

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

130

 1    follows.  That they agree Ms. Perry is a career offender

 2    and that her guideline range was and is 188 to 235 months.

 3    The parties have also agreed Ms. Perry is subject to a

 4    statutorily mandated term of imprisonment of at least five

 5    years.  Citing to Federal Rule of Criminal Procedure

 6    11(c)(1)(c), the parties agree that a sentence of

 7    imprisonment for Count Two shall be at least seven years.

 8            And, furthermore, the Government also agrees not

 9    to seek a sentence above the top of the guideline range

10    calculated in Part 2B of this Presentence Investigation

11    report.

12            According to the Presentence Investigation Report

13    and for purposes of the sentencing guidelines, Ms. Perry

14    is responsible for the distribution of between 28.35 and

15    112 grams of cocaine base as laboratory tests performed on

16    two of the three purchased quantities resulted in a total

17    of 51.43 grams of cocaine base, not including the third

18    transaction which involved less than 2 grams of cocaine

19    base. Ms. Perry was found to engage in these narcotic

20    transactions while on parole and probation supervision

21    with the Michigan Department of Corrections.  This

22    information was based on my reading of paragraph 14 on

23    page six of the Presentence Investigation Report.

24            Let me speak to both counsel.  Referring to the

25    computations by the Probation Department which appear on

*11-20677; United States of America v. Latoya Perry*

1    page seven of the Presentence Investigation Report, do

2    counsel have any objection to the computations as set

3    forth on page seven, paragraphs 18 through and 28?

4              **MR. MARTIN:**  None from the Government.

5              **MS. DWYER:**  None from the defense.

6              **THE COURT:**  According to paragraph 25 of

7    chapter four, strike that, according to paragraph 25 of

8    the Presentence Investigation Report, the language reads

9    as follows.  Quote, the defendant was at least 18 years

10   old at the time of the instant offense of conviction.  The

11   instant offense of conviction is a felony as either a

12   crime of violence or a controlled substance offense.  And

13   the defendant has at least two prior felony convictions of

14   either a crime of violence or a controlled substance

15   offense.  Therefore, the defendant is a career offender.

16          The Offense Level for a career offender is 34,

17   citing to sentencing guideline range 4B1.1.  A review of

18   the defendant's criminal history as it appears in the

19   Presentence Investigation Report is sadly a very lengthy

20   one for it covers several pages in the Presentence

21   Investigation Report, and more specifically, it's found on

22   paragraphs 29 through 68.

23          Contrary to Ms. Perry's counsel's argument, I do

24   not believe that the sentence structure -- I do not

25   believe that the sentencing guideline range overstates Ms.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

132

```
 1      Perry's criminal history.  I have said on many occasions
 2      that the imposition of a sentence upon a defendant is
 3      possibly and probably is the most difficult task that I
 4      have as a Federal Judge.  The hope of this Court is that
 5      the sentence that is imposed reflects the seriousness of
 6      the offense and will promote justice as this committee
 7      expects.
 8           I think it is fair to say that Ms. Perry's life
 9      has been dealt a harsh -- has been dealt harshly for there
10      are many, many instances where she has been figuratively
11      forced into the community to survive.  Replete through her
12      family history are unforced homicides, early age pregnancy
13      and the like.
14           Ms. Perry was born in Detroit, Michigan on the
15      fifth of October of 1974. Ms. Perry, while acknowledging
16      that she did not suffer from any neglect by her mother as
17      a child, she was physically abused in the beatings that
18      were administered to her by her stepfather.  There were as
19      Doctor Wendt has mentioned, episodes, sadly, of sexual
20      abuse upon her by members of her family.  I shall not read
21      into this record the recitations that appear on page 21,
22      paragraph 69, which speak to the physical and emotional
23      trauma that has been placed upon Ms. Perry by members of
24      her family.
25           Ms. Perry has one full sister, one maternal
```

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

133

1    half-sister, and two maternal half-brothers all of whom

2    reside in or around Detroit, Michigan.  Sadly, one

3    brother, DeMario, was murdered in 2011 it has been alleged

4    that as a result of the altercations between her brother

5    and other parties, that he was murdered in Detroit, a

6    homicide that is allegedly connected with drug

7    trafficking.

8           Ms. Perry has three children, namely, Lakia (ph),

9    Terry, and Marcellus.  Much has been made today of Ms.

10   Perry's use of drugs, some of which has been used by her

11   to assist her in reducing or eliminate anxieties.  But,

12   unfortunately, not all of it has been used for that

13   purpose.

14          I have listened to Doctor Jeffrey Wendt, the

15   psychologist who was retained by Ms. Perry to testify in

16   this case, and he has testified and opined with regard to

17   his findings.  Doctor Wendt has submitted a multi-page

18   report on his findings and concluded that the, quote,

19   available information supports a conclusion that Ms. Perry

20   suffers from a mood disturbance in the form of Bipolar I

21   Disorder and Anxiety Disorder in the form of PTSD.  Doctor

22   Wendt further states, quote, it was my opinion that Ms.

23   Perry meets the diagnostic criteria for a Post-Traumatic

24   Stress Disorder and Bipolar I Disorder.

25          I've listened to Doctor Wendt's recitation and I

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

134

 1    have attempted to evaluate his conclusions based on his

 2    examination.  Unfortunately, I find it difficult to accept

 3    his conclusions as it relates to Ms. Perry.  And thus I

 4    cannot and will not accept Doctor Wendt's conclusions as

 5    announced in this court today.

 6          As noted earlier, the parties in this agreement --

 7    to this agreement have both indicated that the appropriate

 8    sentencing guideline range is 188 to 235 months based upon

 9    a total Offense Level of 31 and a Criminal History

10    Category of 6.

11          I shall now attempt to evaluate the factors as set

12    forth in Title 18 United States Code Section 3553(a).

13    With regard to Section A(1) which identifies -- which has

14    been identified as the nature and circumstances of the

15    offense and the history and characteristics of the

16    defendant, the record in this case indicates that Ms.

17    Perry while awaiting sentencing for her sixth felony

18    conviction and her 17th overall conviction relating to her

19    involvement in the distribution of controlled substances

20    is, as the parties have agreed, is a career offender.

21          In this case the investigating agents made several

22    controlled purchases of cocaine base for a combined total

23    of over 50 grams of cocaine base.  Ms. Perry, like many

24    people who come into this courtroom, has a history of

25    family conflict, complicated by substance abuse on her

*11-20677; United States of America v. Latoya Perry*

 1    part as well as that of her family.  She has been

 2    incarcerated previously and placed on probation as well as

 3    parole supervision.  Ms. Perry has repeatedly violated

 4    community supervision while engaging in new criminal

 5    conduct and substance abuse.

 6         On the first of June of 2006, Ms. Perry, while on

 7    parole, came in contact with law enforcement officers from

 8    the Dearborn, Michigan Police Department who utilized a

 9    cooperating individual to purchase narcotics from her.

10    While Ms. Perry claimed to have completed her GED while

11    incarcerated in Indiana, this is a fact or claim which has

12    not been verified.

13         Unfortunately, as I look through the records in

14    this case, looking for a bright spot in Ms. Perry's

15    background, I found no gainful steady documented

16    employment in the last ten years.  She has, however,

17    indicated she has supported herself by performing

18    occasional cooking or hair styling jobs.  Section 2(a) --

19    strike that.  Section A(2)(a) is designed to reflect the

20    seriousness of the offense and to promote respect for the

21    law and to promote just punishment for the offense.  The

22    Presentence Investigation Report reports that

23    investigating agents made three controlled purchases of

24    controlled base for a combined total of over 50 grams of

25    cocaine base.  This illegal conduct took place while she

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

136

1    was on parole and after having previously been found to be

2    in violation of her parole.

3           Unfortunately, Ms. Perry has not responded

4    positively to her probationary sentences for shorter

5    periods of incarceration.  Shorter periods of

6    incarceration, therefore, have been unsuccessful in

7    promoting her respect for the law.

8           Section A(2)(b), which is designed to afford

9    adequate deterrence to criminal conduct, suggests that

10   shorter periods of incarceration have not, sadly, deterred

11   Ms. Perry from criminal conduct.

12          Section A(2)(c) which is designed to protect the

13   public from further crimes of the defendant, while I

14   believe that it is -- that a period of incarceration would

15   serve to incapacitate Ms. Perry and, therefore, protect

16   the public in the short term, successful rehabilitation of

17   Ms. Perry offers a more inexpensive, shorter term answer

18   to the threat imposed by her criminal conduct.

19          Section A(2)(d) which is designed to provide the

20   defendant with needed educational or vocational training.

21   She has an extensive history of substance abuse or mental

22   health issues.  I believe that she would benefit from

23   participation in vocational training in order to increase

24   her ability to obtain gainful employment.

25          Section A(3) which asks the Court to identify the

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

 1    kinds of sentences that are available, a probationary

 2    sentence in this case is prohibited.  While this Court may

 3    impose a fine, it is does not appear that Ms. Perry has

 4    the financial means to pay a fine.  Both supervised

 5    release and imprisonment appear to be viable sentencing

 6    options in this case.

 7          As I read through the Presentence Investigation

 8    Report, let me return to the point where I began.  I

 9    believe that Ms. Perry has been dealt a bad hand by

10    society.  I have looked for but unfortunately have not

11    found periods of enlightenment that would in my opinion

12    justify granting Ms. Perry another chance.  She has

13    retained counsel who have in turn retained a psychologist

14    to work on her behalf.  But at this point, nothing seems

15    to have worked.  She has repeatedly -- Ms. Perry has

16    repeatedly violated community supervision by engaging in

17    new criminal conduct and substance abuse.  I wish that I

18    would look to Ms. Perry's background and find that she has

19    completed her GED, but that has not been verified.

20          Ms. Perry has reported no gainful, steady

21    documented employment in the last ten years.  I wish that

22    I could look to Ms. Perry to be a person to whom her

23    children could look to.  I am sure that the comments that

24    she made to the Court today are valid.  But I don't know

25    if the comments that she made today can offset the harm

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*
138

1    that she has done to herself, to her children and to the

2    community.  And thus I will keep in mind the sentencing

3    guidelines that I have referred to earlier.

4         I wish that I could say to myself and Ms. Perry

5    that she is serving as an inspiration to her children.

6    They, like a lot of children in this community, need help

7    and need, as Ms. Perry has used frequently, love.  And

8    unfortunately, Ms. Perry has not been able to import that

9    love.  She has not been a good role model, although that

10   possibly could come in the next several months.

11        At any rate, the Court believes that it is now

12   time for the Court to impose the sentence upon Ms. Perry

13   at this time.  Please stand, Ms. Perry.  Pursuant to the

14   Sentencing Reform Act of 1984, the Court, after

15   considering the guidelines and the factors contained in

16   Title 18, United States Code, Section 3553(a), commit the

17   defendant to the custody of the Bureau of Prisons for a

18   term of 188 months.  It is further recommended that she be

19   designated to an institution for the comprehensive drug

20   treatment program.  Upon her release from imprisonment,

21   she shall be placed on supervised release for a term of

22   four years.  It's further ordered that Ms. Perry pay a

23   special assessment in the sum of $100 which will be due

24   and payable immediately.  I shall waive the imposition of

25   a fine and the cost of incarceration and the cost of

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

139

1    supervision due to Ms. Perry's lack of financial

2    resources.  Mandatory drug testing is ordered.  And while

3    on supervision she is to abide by the standard conditions

4    that have been previously adopted by this Court and shall

5    comply with the following special conditions.

6         Due to Ms. Perry's past drug history, the

7    following condition is ordered.  She shall participate in

8    a program that has been approved by the Probation

9    Department of this district relating to substance abuse

10   which may include testing to determine if she has used or

11   reverted to use of drugs or alcohol.  And due to Ms.

12   Perry's personal history and characteristics of the

13   instant offense, the following conditions are ordered.

14        She shall enroll and participate in a cognitive

15   behavior therapy program which has been approved by the

16   Probation Department of this district.  She shall also

17   participate in a program to obtain an General Educational

18   Development Certificate, that is, a GED, during the term

19   of her incarceration.  If the defendant does not obtain a

20   GED while incarcerated, she shall work toward obtaining a

21   GED during the term of supervised release.

22        The defendant shall also be lawfully and gainfully

23   employed on a full-time basis and shall seek such lawful

24   gainful employment on a full-time basis.  The term

25   full-time is defined by this Court as being 40 hours per

*11-20677; United States of America v. Latoya Perry*

Jeffrey Wendt - Redirect
Friday/March-7-2014

140

1    week.  In the event that she has part-time employment she

2    shall devote the balance of such 40 hours per week to her

3    efforts to obtain additional employment.  And Ms. Perry

4    shall also participate in a program that has been approved

5    by the Probation Department of this district for mental

6    health counseling if deemed be necessary.

7         That concludes the sentence of the Court.  I speak

8    to counsel.  Are there any objections to the sentence that

9    I just imposed?

10        **MR. MARTIN:**  None from the Government, your

11   Honor.

12        **MS. DWYER:**  None from the defense, your

13   Honor.

14        **THE COURT:**  Ms. Perry, as a defendant, you

15   have right to appeal your conviction if you believe that

16   your guilty plea was unlawful or involuntary or if there

17   is some other fundamental defect in these proceedings that

18   was not waived by your guilty plea.  You also have a

19   statutory right to appeal your sentence under certain

20   circumstances if you believe that it was rendered contrary

21   to law.

22        Furthermore, you should be aware that any Notice

23   of Appeal with a few exceptions must be filed within a

24   period of ten days from the date of the entry of the

25   judgment in your case.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

1      I also note that you have entered into a Plea

2   Agreement in which all your rights to appeal this sentence

3   have been waived.  You should be aware that such waivers

4   are generally enforceable.  However, if you believe that

5   your waiver is not enforceable, you may present this

6   argument to the United States Court of Appeals for the

7   Sixth Circuit and, if appropriate, to the United States

8   Supreme Court.

9      And finally, if you are unable to pay the cost of

10   appeal, you may apply for leave to appeal in forma

11   pauperis with this Court.  The phrase, in forma pauperis,

12   is a legal term which means, in affect, that you are

13   without sufficient funds to assume and pay the cost of an

14   appeal.  Furthermore, and if you request, I will direct

15   the Clerk of the Court to prepare and file a Notice of

16   Appeal on your behalf.

17      Ms. Perry, do you understand what I was saying?

18          **THE DEFENDANT:**  That I would file an appeal

19   if what?

20          **THE COURT:**  You have a right to appeal -- let

21   me just read in part the notice that I gave to you.

22      As a defendant, you have a right to appeal your

23   conviction if you believe your guilty plea was unlawful or

24   involuntary or if there is some our fundamental defect in

25   these proceedings that was not waived by your guilty plea.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*                                        142

1          You also have a statutory right to appeal your

2     sentence under certain circumstances if you believe that

3     it was rendered contrary to law.  Furthermore, you should

4     be aware that any Notice Of Appeal, with a few exceptions,

5     must be filed within a period of ten days from the entry

6     of the judgment in your case.

7          Did you hear what I said?

8               **THE DEFENDANT:**  Yes, sir.

9               **THE COURT:**  Do you understand it?

10              **THE DEFENDANT:**  Yes.

11              **THE COURT:**  Do you have any questions?

12              **THE DEFENDANT:**  Yes.  All the letters I had

13    wrote you, because I had wrote them for a reason, and the

14    things that has been done to me since I have been

15    incarcerated -- the lying, all of the accusations, I

16    wanted to try to file a complaint about that as well.  My

17    rights have been violated.

18              **THE COURT:**  Was that contained in these

19    things?

20              **THE DEFENDANT:**  Yes.

21              **THE COURT:**  Then, Ms. Dwyer, do you want --

22              **MS. DWYER:**  I have received copies.

23              **THE DEFENDANT:**  Is there a way because I

24    don't how to go about doing all of this, but I did want to

25    file a complaint.

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

143

1    **THE COURT:**  You have an excellent lawyer and

2    I would suggest that you keep in touch with her and ask

3    her all of the kind of legal questions that you believe

4    are necessary.

5    **THE DEFENDANT:**  I asked her.  She said she

6    don't do the civil -- what I have been going through.  I

7    know she been working hard on my case right here and I

8    know this is probably something separate.  But this is

9    very serious to me because of the pain and suffering that

10   I experienced and I went through.  That is the reason why

11   I wrote the letters to you.  And it took a lot of time out

12   of my life and a lot of focusing and a lot of writing that

13   I really didn't feel like doing but I had to do because of

14   my rights being violated.  So I would like to do something

15   about that situation.

16   **THE COURT:**  Certainly Ms. Dwyer can, among

17   other things, refer you to a lawyer who in her opinion and

18   yours would be adequately equipped and knowledgable to

19   handle that kind of case.

20   **THE DEFENDANT:**  Okay.

21   **THE COURT:**  While Ms. Dwyer may be

22   concentrating her interests in this particular case, she

23   certainly can identify other lawyers in this community who

24   are knowledgeable, who are well equipped to handle your

25   case.

*11-20677; United States of America v. Latoya Perry*

1          **THE DEFENDANT:**  Okay.  I just hate this

2     happened all at once because I know I made some mistakes,

3     but I didn't feel I deserved the 188 months.  That's a

4     long time.  And I'm not the type of person he making me

5     out to be as far as the girls being in the hotel rooms,

6     officers lying on their reports and me being at somebody's

7     house, another runaway.  He made it sound like I was this

8     type of person but I am not that type of person, your

9     Honor.  And I know I couldn't argue that, but I wanted to

10    when I first seen it in the files when Andrew Wise was my

11    attorney all the things he put in there and said that I

12    have done and the type person that I am.  I didn't like

13    what was said and stated.  And also my little brother was

14    murdered for drugs.  He was murdered because he testified

15    and was a witness on his girlfriend dying and I also

16    cooperated with that when the detectives and homicide came

17    out to see me, me cooperating.  But you didn't know

18    anything about these things.  So much been going on with

19    the case, it was too much to bring every detail to your

20    attention.  But these are the things that I wanted to

21    bring to your attention because these are the things that

22    are making me look bad and making me look like I am a

23    menace to society or that I do harm kids and all of that.

24    I don't do things like that.

25          Also drugs found in my kid's pocket, that wasn't

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*
145

1    true as well.  And a lawyer that I had in Indiana he knew

2    that the officers was lying and the Judge knew those

3    things, too. That's why I didn't get convicted of those

4    crimes.  My daughter and my son, too, he's in college.

5    She graduated from high school.  He graduated from high

6    school.  And they was waiting on me.  I do talk to them in

7    positive ways.  We have good kids.  These are the two of

8    my sister's kids.

9             **MR. MARTIN:**  Your Honor, I'm sorry to

10   interrupt.  But sentence has been imposed.  She has had

11   her opportunity to address the Court.  Her counsel has

12   made arguments.  We have covered this.

13            **THE DEFENDANT:**  This is the type of person he

14   is.

15            **MR. MARTIN:**  I would ask the Court now that

16   you imposed sentence to adjourn these proceedings and

17   allow Ms. Perry, if she feels something was done

18   improperly, to pursue her legal remedies through appeal.

19            **THE COURT:**  I will do that.  I recognize that

20   this is an emotional time for her so I am trying to be

21   sympathetic and understanding.

22            **THE DEFENDANT:**  And I appreciate it.  I

23   appreciate that.

24            **THE COURT:**  I have a responsibility as a

25   Judge in this case to impose a sentence that in my opinion

*11-20677; United States of America v. Latoya Perry*

*Jeffrey Wendt - Redirect*
*Friday/March-7-2014*

146

 1    reflects the seriousness of the offense.

 2              **THE DEFENDANT:**  May I say something? His

 3    spirits and the type of person he is is the type of person

 4    that looks at me negative. And these are the type of

 5    people I have been around -- lying on me and accusing me

 6    of things that I didn't do.  So I understand he's doing

 7    his job.

 8              **THE COURT:**  I think --

 9              **THE DEFENDANT:**  I'm not trying to disrespect

10    Mr. Michael or nothing like that, but when I first met him

11    he told me if I cooperated with him --

12              **THE COURT:**  Thank you, Ms. Perry.  I do

13    recommend that you speak with your counsel who is very

14    knowledgeable and can provide you with all the necessary

15    information.  And you said, Ms. Dwyer, you said you had

16    copies.

17              **MS. DWYER:**  Yes.

18              **THE COURT:**  Anything else, Ms. Dwyer?  Ms.

19    Perry?

20              **THE DEFENDANT:**  You said you got all the

21    copies of the papers?

22              **MS. DWYER:**  Yes.

23              **MR. MARTIN:**  Nothing further, your Honor.

24    Thank you for your time.

25              **THE COURT:**  Thank you.


          *11-20677; United States of America v. Latoya Perry*

1                    **C E R T I F I C A T I O N**

2            I, Lawrence R. Przybysz, official court reporter

3       for the United States District Court, Eastern District of

4       Michigan, Southern Division, appointed pursuant to the

5       provisions of Title 28, United States Code, Section 753,

6       do hereby certify that the foregoing is a correct

7       transcript of the proceedings in the above-entitled cause

8       on the date hereinbefore set forth.

9            I do further certify that the foregoing

10      transcript has been prepared by me or under my direction.

11

12
          s/Lawrence R. Przybysz
13        Official Court Reporter

14                                    -   -   -

15

16

17

18

19

20

21

22

23

24

25

            *11-20677; United States of America v. Latoya Perry*